FILED

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA**

2014 FEB 20  P 4: 28

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| SD3, LLC and SawStop, LLC, | ) | |
| | ) | |
| Plaintiffs | ) | **COMPLAINT** |
| | ) | |
| v. | ) | |
| | ) | |
| Black & Decker (U.S.), Inc., | ) | **CIVIL ACTION NO.:** 1:14cv191 |
| Black & Decker Corp., | ) | CMH / TRJ |
| Chang Type Industrial Co., Ltd. | ) | |
| Delta Power Equipment Corp., | ) | |
| DeWALT Industrial Tools, | ) | |
| Emerson Electric Company, | ) | **JURY TRIAL DEMANDED** |
| Hitachi Koki Co., Ltd. | ) | |
| Hitachi Koki USA Ltd., | ) | |
| Makita Corporation | ) | |
| Makita USA, Inc., | ) | |
| Milwaukee Electric Tool Corp., | ) | |
| One World Technologies Inc., | ) | |
| OWT Industries, Inc., and | ) | |
| Pentair Corporation, | ) | |
| Porter-Cable Corporation, | ) | |
| Robert Bosch GmbH, | ) | |
| Robert Bosch Tool Corporation, | ) | |
| Ryobi Technologies, Inc. | ) | |
| SKIL Power Tools, | ) | |
| Stanley Black & Decker, Inc., | ) | |
| Techtronic Industries, Co., Ltd., and | ) | |
| Techtronic Industries North America, Inc., | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiffs SD3, LLC and SawStop, LLC and SD3 (collectively "Plaintiffs"), by and through

undersigned counsel, file this Complaint against Black & Decker (U.S.), Inc., Black & Decker

Corp., Chang Type Industrial Co., Ltd., Delta Power Equipment Corp., DeWALT Industrial

Tools, Emerson Electric Company, Hitachi Koki Co., Ltd., Hitachi Koki USA Ltd., Makita

Corporation, Makita USA, Inc., Milwaukee Electric Tool Corp., One World Technologies Inc.,

OWT Industries, Inc., Pentair Corporation, Porter-Cable Corporation, Robert Bosch GmbH,

Robert Bosch Tool Corporation, Ryobi Technologies, Inc., SKIL Power Tools, Stanley Black & Decker, Inc., Techtronic Industries, Co., Ltd., and Techtronic Industries North America, Inc., (collectively "Defendants"). Plaintiffs also name the Power Tool Institute, Inc. ("PTI") and Underwriters Laboratories,Inc. and/or UL, LLC ("UL") as co-conspirators. Plaintiffs aver the following upon knowledge as to their own acts and facts and upon information and belief as to the acts and facts of all others.

## I.   NATURE OF ACTION

1.     Defendants engaged in a group boycott of Plaintiffs' safety products for table saws beginning around 2001 or 2002, by agreeing among themselves to collectively refuse Plaintiffs' offers to license its active injury mitigation technology ("SawStop Technology"), and by fraudulently concealing that conspiracy.

2.     Plaintiffs bring this suit against Defendants for violating Section 1 of the Sherman Antitrust Act of 1890 (the "Sherman Act"), 15 U.S.C. § 1, by collectively refusing to license Plaintiffs' SawStop Technology, and fraudulently concealing that conspiracy.

3.     Plaintiffs could not have discovered the group boycott conspiracy until at least February 25, 2010, when David Peot, a retired Director of Advanced Technologies and Director of Engineering for Defendant Ryobi Technologies, Inc. ("Ryobi"), first exposed the conspiracy during his testimony in a product liability trial. Trial Tr., Day 4, 111:14-112:9, 125:2-126:8, *Osario v. One World Techs. Inc.*, Case No. 06-CV-10725 (D. Mass. Feb. 22, 2010 to March 4, 2010).

4.     Defendants conspired to influence changes in UL safety standards, beginning around 2001, to prevent active injury mitigation technology from becoming a part of the UL safety standard.

2

5.      Plaintiffs bring this suit against Defendants for violating Section 1 of the Sherman Act, 15 U.S.C. § 1, by conspiring to corrupt UL standards-making , beginning around 2001, thereby preventing active injury mitigation technology from becoming a standard of the table saw industry, and limiting Plaintiffs' opportunities to sell SawStop table saws.

6.      Defendants conspired to change UL safety standards, beginning around 2003, to limit competition in table saw blade guards, thereby preventing SawStop from continuing to sell its then-current blade guard and causing SawStop to incur unnecessary additional expense to redesign a blade guard to comply with the changed UL safety standards.

7.      Plaintiffs bring this suit against Defendants for violating Section 1 of the Sherman Act, 15 U.S.C. § 1, by conspiring to corrupt UL standards to limit competition in the design of table saw blade guards, beginning around 2003.

## II.    JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act of 1914 (the "Clayton Act"), 15 U.S.C. §§ 15, 26, and Sections 1331, 1332, and 1337 of the United States Judicial Code, 28 U.S.C. §1331, in that it was brought under the federal antitrust laws, and 28 U.S.C. § 1332, in that Plaintiffs and Defendants are from different states and the amount in controversy exceeds $75,000, and 28 U.S.C. § 1337.

9.      Venue is appropriate in this district pursuant to Sections 4(a), 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 22, and 26, and Sections 1391(b), (c) and (d) of the United States Judicial Code, 28 U.S.C. § 1391(b), (c) and (d), because one or more of the Defendants reside, are licensed to do business, are doing business, transact business, are found or have agents in this district, and, as to the foreign Defendants, pursuant to 28 U.S.C. 1391 (c)(3).

10.     Personal jurisdiction over each of the Defendants is proper in this district pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, in that each of the Defendants resides, is found, transacts business, or has an agent in this district. Personal jurisdiction over each of the Defendants is also proper in the Eastern District of Virginia in that the claims asserted here arise from one or more of the following acts:

    a.     Each of the Defendants, in person, through an agent, or through its subsidiary, transacts business within the Commonwealth of Virginia or has consented to supply services in the Commonwealth of Virginia; or

    b.     Each of the Defendants, in person, through an agent, or through its subsidiary, has committed a tortious act within the United States; or

    c.     Each of the Defendants, in person, through an agent, or through its subsidiary committed a tortious act outside the Commonwealth of Virginia causing injury to persons or property within the Commonwealth of Virginia and regularly does or solicits business in the United States; or

    d.     Each of the Defendants, in person, through an agent, or through its subsidiary committed a tortious act outside the Commonwealth of Virginia causing injury to persons or property within the Commonwealth of Virginia; each expected or should reasonably have expected the act to have consequences in the Commonwealth of Virginia; and each derived substantial revenue from interstate or international commerce.

11.     The activities of the Defendants and their co-conspirators were within the flow of, and were intended to, and did, have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

12.     Personal jurisdiction is also available under the Commonwealth of Virginia's Long-Arm Statute, Va. Code. Ann. §8.01-328.1, in that Defendants' illegal actions in the Commonwealth of Virginia, such as the sale of lower safety, lower price table saws, caused SawStop, LLC to lose sales and profits, as well as injured the residents of the Commonwealth of Virginia.

### III.     PARTIES

#### A.     PLAINTIFFS

13.     Plaintiff SD3, LLC ("SD3") is an Oregon limited liability company with its principal place of business at 9564 S.W. Tualatin Road, Tualatin, Oregon 97062.  SD3 is the parent company of Sawstop, LLC.  Dr. Stephen F. Gass is a member and founder of SD3, LLC and he, along with co-inventors, invented a type of active injury mitigation technology for table saws and other power tools known as the SawStop Technology.  Dr. Gass and his co-inventors have a portfolio of many extant United States Patents issued to them directed to various aspects of SawStop Technology.  Active injury mitigation technology detects proximity or contact between an operator and a dangerous part of a power tool, such as a saw blade in a table saw, and then takes some action to mitigate injury to the operator.  The SawStop Technology is an implementation of active injury mitigation technology.  In table saws, the SawStop Technology detects contact between a person and the blade and then stops and retracts the blade to mitigate injury, as explained more fully below.  SD3, LLC holds the Gass *et al.* patent portfolio directed to SawStop Technology

14.     Plaintiff SawStop, LLC is an Oregon limited liability with its principal place of business at 9564 S.W. Tualatin Road, Tualatin, Oregon 97062.  SD3, LLC is SawStop, LLC's parent company.  SawStop, LLC makes and sells table saws equipped with the SawStop Technology.

15.     SD3, LLC marketed and offered to license the SawStop Technology, including the

extensive Gass *et al.* patent portfolio, to table saw manufacturers, but these negotiations were

unsuccessful.

16.     After negotiations with Black & Decker, Bosch, Emerson, Ryobi, and other table saw

manufacturers to license the SawStop Technology ended, SawStop, LLC designed and brought

to market its own table saws incorporating the SawStop Technology.

17.     SawStop, LLC's first table saw was sold and delivered to the public on or about August

2004.

18.     SawStop Technology, as implemented by SawStop, LLC on table saws, is a type of

active injury mitigation technology, which includes a safety system that detects accidental

contact between a person and the spinning blade of the saw and then reacts to minimize any

injury.  Detecting contact and minimizing injury are carried out by separate systems.  The

contact detection system works by recognizing differences between the electrical properties of

wood (or any non-conductive material) and a person.  The system generates an electrical signal

onto the blade, and then monitors that signal for changes caused by contact with a person's body.

The signal remains unchanged when the blade cuts wood because of the small inherent

capacitance and conductivity of wood.  However, when a person touches the blade, the signal

instantly changes because of the relatively large inherent capacitance and conductivity of a

person's body relative to wood.  The reaction system acts to minimize injury when contact is

detected.  In a table saw, the reaction system typically uses a spring to push a block of aluminum

or plastic, called a brake pawl, into the teeth of the blade to instantly stop the blade from

spinning.  The spring is held in compression by a fuse wire until the detection system detects

contact.  When the detection system detects contact, the reaction system releases the spring by

burning the fuse wire with a surge of electricity. The spring pushes the brake pawl into the teeth of the spinning blade and the teeth cut into the pawl and bind, thereby stopping the blade. The brake pawl is part of a replaceable cartridge that includes the spring, fuse wire, and electronics necessary to burn the fuse wire. The action of stopping the blade also causes the blade to retract and drop below the table. Detecting accidental contact and burning the fuse wire to release the spring happens within less than a millisecond, or 1/1000th of one second. In a table saw with a 10-inch diameter blade, the blade typically stops within 3 milliseconds. A human would need several hundred milliseconds to react to an unexpected event like contacting a saw blade, so the SawStop Technology reacts about 100 times faster than a person. As a result, a person accidentally contacting a spinning blade in a saw equipped with the SawStop Technology typically would receive only a small nick.

19.     SawStop, LLC currently sells three types of table saws:

      a.      industrial cabinet saws, which are large, heavy-duty table saws that run on 230-volt or higher voltage and have 3, 5, or 7.5 horsepower motors,

      b.      professional cabinet saws, which are also heavy-duty table saws that have 3 or 1.75 horsepower motors, and

      c.      contractor saws, which are smaller and which run on 120-volt power.

20.     Sawstop, LLC saws and the SawStop Technology have received numerous awards, including:

      a.      **Chairman's Commendation.** The U.S. Consumer Product Safety Commission ("CPSC") awarded the technology a Chairman's Commendation for significant contributions to product safety. That award was reported nationally on CNN Headline News.

7

b.   **Challenger's Award.**  At an International Woodworking Fair in Atlanta, Georgia, the technology won the Challenger's Award, which is the woodworking industry's highest honor.  It recognizes the most innovative and technically advanced improvements to woodworking equipment.

c.   **Breakthrough Award.**  Popular Mechanics magazine award honoring America's top innovators.

d.   **One of the 100 Best New Innovations.**  Popular Science magazine award honoring new innovations.

e.   **One of the Top 10 Tools.**  Workbench magazine award honoring the top innovative tools.

f.   **Award of Quality Editor's Choice.**  Workbench magazine.

g.   **Reader's Choice Award.**  Woodshop News magazine award given to a new tool or machine that has significantly increased productivity or quality of work.

h.   **Best Innovations Award.**  Time magazine award to recognize significant innovations.

i.   **Woodwork Institute of California Endorsement.**  The Woodwork Institute of California has endorsed the technology, stating:

> As a Trade Association in the construction industry (representing over 250 manufacturers of architectural millwork with an excess of 4,000 employees, all of whom use saws of one type or another) we find your SawStop Technology and its potential of eliminating or reducing worker injury of extreme significance.  Generally, we would not endorse a commercial product; however the potential benefit to our members and their employees of implementing the SawStop Technology on the tools used within our industry overrides such.

j.   **Sequoia Award.**  Association of Woodworking & Furnishings Suppliers award recognizing leadership in ergonomics and safety.

    k.      **Imhotep Award.** Award from the International Social Security Association, Construction Section on Occupational Safety and Health in the Construction Industry, recognizing innovative safety technology.

    l.      **Nova Award.** Construction Innovation Forum.

    m.     **Editor's Choice Award.** Tools of the Trade magazine.

    n.      **Editor's Best Overall Choice and Readers Choice Awards.** Taunton's Tool Guide (publisher of Fine Woodworking magazine).

    o.      **Heartwood Award.** Architectural Woodwork Institute award in recognition of outstanding safety contributions.

21.    SawStop, LLC has compiled a list of over 2000 incidents ("Finger Saves") in which a user contacted the blade on a table saw with SawStop Technology and the SawStop Technology reacted to mitigate injury, over 95% of the time resulting in a nick that required only a band-aid or less for treatment.

**B.**    **DEFENDANTS**

22.    **Black & Decker (U.S.), Inc.** is Maryland Corporation with its principal place of business at 701 East Joppa Road, Towson, MD 21286. On March 12, 2010, Stanley Works completed a merger with Black & Decker, forming Stanley Black & Decker, Inc. ("Black & Decker"). Black & Decker is a leading global manufacturer and marketer of power tools and accessories, hardware and home improvement products, and technology-based fastening systems. Black & Decker (U.S.), Inc. conducts business in the Commonwealth of Virginia and maintains a registered agent in the Commonwealth of Virginia: CT Corporation System, 4701 Cox Road, Suite 285, Glen Allen, VA 23060. Black & Decker (U.S.), Inc. has transacted business in the Commonwealth of Virginia by using the U.S. Patent and Trademark Office in Alexandria, VA to

apply for approximately 77 patents for technology and processes that will be used in their manufacturing operations.

23.     **Black & Decker Corp.** is a Maryland Corporation with its principal place of business at 1000 Stanley Drive, New Britain, Connecticut, 06053. On March 12, 2010, Stanley Works completed a merger with Black & Decker, forming Stanley Black & Decker, Inc. ("Black & Decker"). Black & Decker is a leading global manufacturer and marketer of power tools and accessories, hardware and home improvement products, and technology-based fastening systems. Until the merger with Stanley Works, Black & Decker Corp. conducted business in the Commonwealth of Virginia.

24.     **Stanley Black & Decker, Inc.** ("Black & Decker") is a Connecticut corporation headquartered at 1000 Stanley Drive, New Britain, CT 06035 that was created on March 12, 2010, with the merger of Stanley Works and Black & Decker, Inc. Black & Decker is a leading global manufacturer and marketer of power tools and accessories, hardware and home improvement products, and technology-based fastening systems. Black & Decker had total revenues of $10.2 billion in 2012, with 48% of that revenue from sales in the United States. Black & Decker brands have included Delta Machinery (acquired 2005; sold 2011), DeWALT (acquired by Black & Decker Corp. in 1960), and Porter-Cable (acquired 2005). Black & Decker is a member of the Power Tool Institute, Inc. Black & Decker has representatives on Standards Technical Panel 745, which controls UL Safety Standard 987, *Stationary and Fixed Electric Tools*. Black & Decker conducts business in the Commonwealth of Virginia and maintains a registered agent in the Commonwealth of Virginia: CT Corporation System, 4701 Cox Road, Suite 285, Glen Allen, VA 23060. Black & Decker has transacted business in the Commonwealth of Virginia by using the U.S. Patent and Trademark Office in Alexandria, VA to

apply for approximately 67 patents for technology and processes that will be used in their manufacturing operations. According to its websites, www.stanleytools.com and www.blackanddecker.com, Black & Decker sells its products through at least three hundred (300) dealers located in the Commonwealth of Virginia, including at Ace, Bed Bath & Beyond, BJ's Wholesale Club, Do it Best, Home Depot, Fred Meyer, Kmart, Lowe's, Marvin's, Meijer, Menards, Sam's Club, Sears, Target, True Value, and WalMart stores.

25. **Chang Type Industrial Co., Ltd. ("Chang")** is headquartered at 41, Nantsuen Rd., Houli Dist, Taichung City, Taiwan (R.O.C.) and is the parent of Delta Power Equipment Corp., which conducts business in the Commonwealth of Virginia as described below.

26. **Delta Power Equipment Corp.** ("Delta Machinery") is headquartered at 5520 Airport Road, Anderson, South Carolina 29626. From 1981 to 2004 Delta Machinery was part of the Pentair Tools Group, consisting of Porter-Cable, Delta Machinery, and DeVilbiss Air Power. The Pentair Tools Group was acquired by Black & Decker Corp. in 2005. Chang Type Industrial Co., Ltd. acquired Delta Machinery from Black & Decker in 2011. According to its website, www.deltamachinery.com/dealer-search-results/directory/combined, Delta Machinery conducts business in the Commonwealth of Virginia and sells its products through at least the six (6) dealers located in the Commonwealth of Virginia.

27. **DeWALT Industrial Tools ("DeWALT")** is a subsidiary of Black & Decker that manufactures and sells power hand tools and accessories in the United States. Its corporate offices are located at 701 Joppa Road, Baltimore, MD 21286. DeWALT conducts business in the Commonwealth of Virginia and its parent, Black & Decker, maintains a registered agent in the Commonwealth of Virginia: CT Corporation System, 4701 Cox Road, Suite 285, Glen Allen,

VA 23060.  According to its website, www.dewalt.com/Find-Retailer-Results, DeWALT sells its

products through at least the thirty (30) dealers in the Commonwealth of Virginia.

28.     **Porter-Cable Corporation** ("Porter-Cable") is a subsidiary of Black & Decker with

headquarters located at 4825 Highway 45 N #800, Jackson, Tennessee 38305-7900, that

manufactures and sells power tools in the United States.  Porter-Cable products include portable

belt sanders, helical drive circular saws, and portable band saws.  Prior to its acquisition by

Black & Decker Corp. in October 2004, Porter Cable was a part of the Pentair Tools Group,

consisting of Porter-Cable, Delta Machinery, and DeVilbiss Air Power.  Porter-Cable conducts

business in the Commonwealth of Virginia and its parent, Black & Decker, maintains a

registered agent in the Commonwealth of Virginia: CT Corporation System, 4701 Cox Road,

Suite 285, Glen Allen, VA 23060.  Porter-Cable has transacted business in the Commonwealth

of Virginia by using the U.S. Patent and Trademark Office in Alexandria, VA to apply for

approximately 104 patents for technology and processes that will be used in their manufacturing

operations.  According to its website, www.portercable.com/ServiceandSupport/Service

Centers.aspx, Porter-Cable sells its products in at least eighteen (18) locations in the

Commonwealth of Virginia.

29.     **Robert Bosch GmbH** is headquartered at Bosch Service Center, Postfach 30 02 20,

Stuttgart, 70442, Germany, and operates in the United States and the Commonwealth of Virginia

through its subsidiary Robert Bosch Tool Corporation, as described below.  Bosch's brands

include Dremel (acquired 1993), SKIL (part of a joint venture formed between Emerson Electric

Company and Bosch in 1991 called S-B Power Tool Co. and then fully acquired by Bosch in

1996), and Vermont American Power Tool Accessories (acquired 2003).

12

30.    **Robert Bosch Tool Corporation** ("Bosch") is a Delaware corporation headquartered at

1800 W. Central Road, Mount Prospect, IL 60056.  Bosch manufactures power tools and power

tool accessories, and engages in the design, manufacture, and sale of power tools, rotary and

oscillating tools, accessories, laser and optical levelling and range finding tools, and garden and

watering equipment.  Bosch sells its products in the United States.  Bosch's brands include

Bosch, Dremel (acquired 1993), Freud, SKIL (part of a joint venture formed between Emerson

Electric Company and Bosch in 1991 called S-B Power Tool Co. and then fully acquired by

Bosch in 1996), and Vermont American Power Tool Accessories (acquired 2003).  Bosch Power

Tools and Robert Bosch Tool Corp. are members of the Power Tool Institute, Inc.  Bosch has

representatives on Standards Technical Panel 745, which controls UL Safety Standard 987,

*Stationary and Fixed Electric Tools.*  Bosch conducts business in the Commonwealth of Virginia

and maintains a registered agent in the Commonwealth of Virginia: Corporation Service

Company, Bank of America Center, 16th Floor, 1111 East Main Street, Richmond, VA 23219.

Bosch has transacted business in the Commonwealth of Virginia by using the U.S. Patent and

Trademark Office in Alexandria, VA to apply for approximately 22 patents for technology and

processes that will be used in their manufacturing operations.  According to Bosch's website,

www.boschtools.com, Bosch sells its products in at least two hundred (200) locations in the

Commonwealth of Virginia.

31.    **SKIL Power Tools** ("SKIL") is a wholly owned subsidiary of the Robert Bosch Tool

Corporation, headquartered at 1800 West Central Road, Mount Prospect, IL 60056, that

manufactures electric power tools and accessories.  SKIL is a member of the Power Tool

Institute, Inc.  SKIL conducts business in the Commonwealth of Virginia.  According to its

website, http://www.skiltools.com/Parts-And-Service/Pages/Where-To-Buy.aspx, SKIL sells its products in at least one hundred seventy seven (177) locations in the Commonwealth of Virginia.

32. **Emerson Electric Company** ("Emerson") is a Missouri corporation headquartered at 8000 West Florissant Avenue, St. Louis, MO, 63136, that manufactures power equipment. Emerson sells its products throughout the United States. Emerson formed SKIL Power Tools with Bosch in 1991, called S-B Power Tool Co. at the time, which was fully acquired by Bosch in 1996. Emerson had representatives on Standards Technical Panel 745, which controls UL Safety Standard 987, *Stationary and Fixed Electric Tools.* Emerson conducts business in the Commonwealth of Virginia and maintains a registered agent in the Commonwealth of Virginia: CT Corporation System, 4701 Cox Road, Suite 285, Glen Allen, VA 23060. Emerson has transacted business in the Commonwealth of Virginia by using the U.S. Patent and Trademark Office in Alexandria, VA to apply for approximately 1,944 patents for technology and processes that will be used in their manufacturing operations.

33. **Hitachi Koki Co., Ltd.** is headquartered at Shinagawa Intercity Tower A, 20th Floor, 15-1, Konan 2-chome, Minato-ku, Tokyo 108-6020, Japan, is the parent of Hitachi Koki USA Ltd., and conducted business in the Commonwealth of Virginia and the United States through its subsidiary as described below.

34. **Hitachi Koki USA Ltd.** ("Hitachi") is headquartered at 3950 Steve Reynolds Boulevard, Norcross, GA 30093, and manufactures many types of power tools including chainsaws, drills, and woodworking power tools, metalworking power tools, cordless power tools, construction power tools, pneumatic tools (nailers, screwdrivers and compressors for nailers), woodworking machines, outdoor power equipment, gardening tools, household power tools, dust collectors, measure laser tools, and other accessories such as diamond tools and consumable parts, which

are sold in the United States.  Some products are branded Koki Tanaki.  Hitachi is a member of

the Power Tool Institute, Inc.  Hitachi has transacted business in the Commonwealth of Virginia

by using the U.S. Patent and Trademark Office in Alexandria, VA to apply for approximately

1,103 patents for technology and processes that will be used in their manufacturing operations.

Hitachi conducts business in the Commonwealth of Virginia, according to its website,

www.hitachipowertoools.com/index/main-navigation/find-a-retailer.aspx, by selling its products

in at least eighty three (83) locations in the Commonwealth of Virginia.

35.     **Makita Corporation** is headquartered at 3-11-8, Sumiyoshi-cho, Anjo, Aichi 446-8502,

Japan, is the parent of Makita USA, Inc. and operates in the United States and the

Commonwealth of Virginia through its subsidiary Makita USA, Inc. as described below.

36.     **Makita USA, Inc.** ("Makita") is a California corporation headquartered at 14930

Northam Street, La Mirada, CA 90638, and manufactures power tools and outdoor power

equipment sold in the United States.  Makita is a member of the Power Tool Institute, Inc.

Makita has representatives on Standards Technical Panel 745, which controls UL 987, *Stationary

and Fixed Electric Tools*.  Makita conducts business in the Commonwealth of Virginia and

maintains a registered agent in the Commonwealth of Virginia: Corporation Service Company,

Bank of America Center, 16th Floor, 1111 East Main Street, Richmond, VA 23219.  According

to its website, www.makitatoolscom/en-us/Modules/Shop/, Makita sells its products in at least

fifty four (54) locations in the Commonwealth of Virginia.

37.     **Techtronic Industries Co., Ltd.** is headquartered at 24/F, CDW Building, 388 Castle

Peak Road, Tsuen Wan, N.T., Hong Kong, is the parent for Techtronic Industries North

America, Inc., and designs, manufactures and markets power tools, outdoor power equipment,

and floor care and appliances. TTI's brands include AEG, Milwaukee Electric (acquired 2005), Ryobi, and Homelite. TTI also makes table saws sold under the Craftsman and Ridgid brands.

38.     **Techtronic Industries North America, Inc.** ("TTI") is headquartered at 303 International Circle, Suite 490, Hunt Valley, MD 21030, and manufactures power tools such as band saws, table saws, biscuit joiners, buffer/polishers, circular saws, combos, cut-off machines, drill presses' drill drivers, grinders, jig saws, laser levels, measuring devices, miter saws, nailers, planers, reciprocating saws, rotary hammers, demolition hammers, sanders, scroll saws, and specialty tools which are sold in the United States. TTI conducts business in the Commonwealth of Virginia. TTI has transacted business in the Commonwealth of Virginia by using the U.S. Patent and Trademark Office in Alexandria, VA to apply for approximately 25 patents for technology and processes that will be used in their manufacturing operations.

39.     **Milwaukee Electric Tool Corp.** ("Milwaukee Electric") is headquartered at 13135 West Lisbon Road, Brookfield, WI 53005-2550 and manufactures portable electric power tools and accessories, which are sold in the United States. From 1995 to 2005, Milwaukee Electric was a subsidiary of Atlas Copco. In 2005, Milwaukee Electric became a subsidiary of Techtronic Industries Co. Ltd. Milwaukee Electric is a member of the Power Tool Institute, Inc. Milwaukee has transacted business in the Commonwealth of Virginia by using the U.S. Patent and Trademark Office in Alexandria, VA to apply for approximately 399 patents for technology and processes that will be used in their manufacturing operations. Milwaukee Electric conducts business in the Commonwealth of Virginia and, according to its website, www.milwaukeetool.com, sells its products in at least twelve (12) locations in the Commonwealth of Virginia.

40.     **Ryobi Technologies, Inc. ("Ryobi")** is a Delaware corporation headquartered at 1428 Pearman Dairy Road, Anderson, SC 29625 and manufactures power tools, including portable benchtop planers, woodcutting systems, and cordless power tools which are sold in the United States under the Craftsman, Ryobi, and Ridgid brand names. Ryobi is a subsidiary of Techtronic Industries Co. Ltd. and a member of the Power Tool Institute, Inc. Ryobi has representatives on Standards Technical Panel 745 which controls UL 987, *Stationary and Fixed Electric Tools.* Ryobi conducts business in the Commonwealth of Virginia.

41.     **One World Technologies Inc. or OWT Industries, Inc. ("OWT")** is a Delaware Corporation headquartered at 225 Pumpkintown Highway, Pickens, SC 29671 and does business as Ryobi Tools, which manufactures power tools, including portable benchtop planers, woodcutting systems, and cordless power tools sold in the United States under the Craftsman, Ryobi, and Ridgid brand names. OWT is a subsidiary of Techtronic Industries Co. Ltd. OWT conducts business in the Commonwealth of Virginia.

42.     **Pentair Corporation** ("Pentair") is headquartered at 5500 Wayzate Boulevard, Suite 800, Minneapolis, MN 55415 and sells products and services relating to water and other fluids, thermal management, and equipment protection, in the United States. The Pentair Tools Group included Porter-Cable, Delta Machinery, and DeVilbiss Air Power until they were acquired by Black & Decker Corp. in October 2004. Pentair conducts business in the Commonwealth of Virginia. Pentair has transacted business in the Commonwealth of Virginia by using the U.S. Patent and Trademark Office in Alexandria, VA to apply for approximately 114 patents for technology and processes that will be used in their manufacturing operations.

## C.    CO-CONSPIRATORS

### i.    Power Tool Institute

43.    Co-conspirator Power Tool Institute, Inc. ("PTI") is an organization with members that manufacture power tools, including table saws.  The PTI has its principal place of business at 1300 Sumner Avenue, Cleveland, Ohio 44115-2851.  According to its website, PTI's "primary objectives are to promote the common business interests of the power tool industry; to represent the industry before government; to educate the public as to the usefulness and importance of power tools; to encourage high standards of safety in the manufacture of power tools; and to prepare and distribute information about safe use of power tools."  PTI estimates the annual shipments of table saws to U.S. customers at between 800,000 to 850,000 units in 2006 and 2007; 650,000 in 2008; 589,000 in 2009; and 429,000 in 2010.

44.    PTI members, during PTI meetings, agreed to and did conspire to boycott SawStop Technology for table saws; fraudulently concealed their group boycott of SawStop Technology; conspired to prevent active injury mitigation technology from being incorporated into UL standard 987, *Stationary and Fixed Electric Tools*; and conspired to incorporate anticompetitive table saw blade guard design standards into UL standard 987, *Stationary and Fixed Electric Tools*, rather than performance standards that would allow competition in the design of blade guards.

### ii.    UL

45.    Co-conspirator Underwriters Laboratories, Inc. and/or UL, LLC ("UL"), is a safety consulting and certification company with its principal place of business at 333 Pfingsten Road, Northbrook, Illinois 60062.  UL provides safety-related certification, validation, testing, inspection, auditing, advising, and training services to a wide range of clients, including

manufacturers, retailers, policymakers, regulators, service companies, and consumers.  UL

maintains a registered agent in the Commonwealth of Virginia: CT Corporation System, 4701

Cox Road, Suite 285, Glen Allen, VA 23060.

46.     According to its press releases, "UL is a premier global independent safety science

company that has championed progress for 120 years.  Its more than 10,000 professionals are

guided by the UL mission to promote safe working and living environments for all people.  UL

uses research and standards to continually advance and meet ever-evolving safety needs.  As

stated in its website, www.ul.com, "We partner with businesses, manufacturers, trade

associations and international regulatory authorities to bring solutions to a more complex global

supply chain."

47.     UL Standards Technical Panel 745 ("STP 745") consisting primarily of manufacturers

and individuals with connections to manufacturers, oversees the content of UL Safety Standard

987, *Stationary and Fixed Electric Tools*, which sets safety standards for table saws.

48.     Members of STP 745 are not required to consider public interests over their own interests

when considering changes to UL Safety Standard 987.

## IV.     TRADE AND COMMERCE

49.     Plaintiffs and Defendants engaged in the manufacture and sale of table saws and related

goods within the continuous and uninterrupted flow of interstate commerce in the United States.

50.     Defendants and their coconspirators, PTI and UL, engaged in the regulation of and

standard setting processes for table saws and related goods within the contiguous and

uninterrupted flow of interstate commerce of the United States.

51.     Defendants' actions were intended to and did substantially impede the contiguous and

uninterrupted flow of interstate commerce of the United States.

19

52.     There are tens of thousands of customers who purchased table saws from Defendants within the Commonwealth of Virginia who have been affected by the conspiracy among Defendants and their co-conspirators.

53.     SawStop, LLC has sold over 800 table saws to customers in the Commonwealth of Virginia, and would have sold additional table saws in the Commonwealth of Virginia but for the effects of Defendants' conspiracies.

## V.     FACTUAL ALLEGATIONS

### A.     TABLE SAW INDUSTRY

54.     Plaintiffs and Defendants engaged in the manufacture and sale of table saws and related goods within the continuous and uninterrupted flow of interstate commerce in the United States.

55.     Defendants and their coconspirators, PTI and UL, engaged in the regulation of and standard setting processes for table saws and related goods within the contiguous and uninterrupted flow of interstate commerce of the United States.

56.     PTI members account for approximately 85% of the sales of all table saws sold in the United States from 1993 to 2003.

57.     There are at least three general classifications of table saws: bench top saws generally weighing less than 80 pounds; contractor saws weighing about 250 pounds; and cabinet saws weighing more than 250 pounds.  Lightweight benchtop table saws generally sell for around $150 to $600 per unit.  Cast iron industrial cabinet saws can sell for thousands of dollars.

58.     The average retail price for a table saw is around $500 per table saw.

59.     PTI estimates the annual shipments of table saws to U.S. customers at between 800,000 to 850,000 units in 2006 and 2007; 650,000 in 2008; 589,000 in 2009; and 429,000 in 2010.

60.     Average annual shipments of table saws in the United States total approximately 700,000 units, with Defendants responsible for approximately 85% of these sales, or 595,000.

## B.     INJURIES FROM TABLE SAWS

61.     In 1998, the U.S. Consumer Products Safety Commission ("CPSC") summoned table saw manufacturers to address the 30,000 annual blade-contact injuries caused by table saws.

62.     Table saw manufacturers responded to the CPSC's concerns in 1999, through their trade group PTI, by stating that they would not be redesigning their saws or changing their guards, but would instead create educational videos encouraging high school shop students to use table saw guards.

63.     On December 8, 1999, the CPSC met with PTI at the UL Research Triangle Office so that PTI could respond to CPSC's table saw injury data. PTI's intended actions to address the high rate of injuries were described in the meeting log as follows:

> PTI believes the current spreader guard is the best possible guard for most thru cuts. Education is the only way to affect the injury hazard patterns seen. Education, not redesigning the guard, is needed to convince operators to use the blade guard. The user must be alerted to the importance of placing the guard back on the table saw. PTI intends to create and send safe use instruction videos to high school vocation teachers. There are no plans to make the videos available at stores like Home Depot or Lowe's.

64.     Beginning in about 2003, after Plaintiffs demonstrated the SawStop Technology to the industry and to the CPSC, power saw manufacturers told the CPSC that a new guard should be implemented, but the CPSC should not adopt a rule mandating active injury mitigation technology.

65.     Today, despite changes to the UL Safety Standard 987 in 2005 and 2007, table saws continue to injure tens of thousands of people annually.

66.    As published in the Comments of National Consumers League, Consumer Federation of

America, Consumers Union, Public Citizen, and U.S. PIRG to the U.S. Consumer Product Safety

Commission on "Table Saw Blade Contact Injuries; Advance Notice of Proposed Rulemaking;

Request for Comments and Information," (Feb. 12, 2012), "Tens of thousands of serious injuries

occur every year as a result of contact with a table saw blade."

67.    The CPSC estimates that there were approximately 33,450 hospital emergency room-

treatments per year due to contact with a table saw blade, based on a study of table saw injuries

in the U.S. during 2007 and 2008.

68.    The total number of injuries in the U.S. from table saws is nearly double the amount of

emergency-room visits.  The CPSC estimates that there are a total of 67,300 medically-treated

blade contact injuries every year, which equates to over 180 medically-treated blade contact

injuries daily.

69.    Injuries caused by table saw blade contact are severe.  They include lacerations (65.9% of

injuries), fractures (12.4%), amputations (12%), and avulsions (8.5%), which is the forcible

tearing away of a body part by trauma.

70.    The number of table saw-related injuries has remained steady from 2001 to 2008.

Medically-treated table saw blade contact injuries impose costs on U.S. consumers of

approximately $2.36 billion each year, or approximately $35,000 per injury.

71.    These costs to society are far greater than the costs to effectively eliminate these injuries.

With about 10 million table saws in use, each table saw, on average, generates over $2,000 in

societal costs over its lifetime, assuming a 10-year product life.  The typical price of a table saw,

in contrast, ranges from $250 to $500 (although some table saws cost several thousand dollars),

and the total annual retail market for table saws in the United States is around $300-$400

million. Thus, on average, each table saw costs society at least 4 times more in injury-related costs than the price of the saw itself.

72.     As stated in Comment of Power Tool Institute, Inc. to U.S. Consumer Product Safety Commission Petition CP 03-2 (Nov. 2003), despite these statistics and the high cost to society from table saw injuries, PTI insists that "table saws are a relatively safe product."

**C.     UL STANDARDS FOR THE TABLE SAW INDUSTRY**

73.     The voluntary safety standard in the United States for table saws is UL 987, *Stationary and Fixed Electric Tools*.

74.     UL 987, *Stationary and Fixed Electric Tools*, was first introduced in 1971.  Updates to the standard occurred in 1983, 1985, 1986, 1988, 1990, 1992, 1994, 1995, 1997, 1998, 1999, 2000, 2005, 2006, 2007, 2009, 2010, 2011, and 2013.

75.     The updates to UL 987 which were subject to the conspiracy described herein are those changing the requirements for blade guards in 2005 and 2007.

76.     The original UL 987 standard required a hood acting as a blade guard, a spreader to help prevent kickback, and an additional antikickback device.

## CONSPIRACY IN RESTRAINT OF SAWSTOP TECHNOLOGY

**A.     CONCERTED REFUSAL TO LICENSE SAWSTOP TECHNOLOGY**

**i.   Nature of Conspiracy**

77.     SD3, LLC offered to license its patents related to the SawStop Technology to Defendants, who comprised the bulk of the table saw industry in the United States.

78.     In August 2000, SawStop, LLC took a prototype table saw incorporating the SawStop Technology to a trade show in Atlanta, Georgia to publicly demonstrate the technology for the first time.  At the trade show, they pushed a hot dog into the teeth of the spinning blade as if the

hot dog were a misplaced finger. The blade would cut through the wood as expected, but stopped when it contacted the hot dog, resulting in only a small nick on the hot dog. Although many woodworkers appreciated the SawStop Technology, table saw manufacturers reacted differently.

79.     James Dartlin Meadows, an attorney who said he had defended Black & Decker in product liability cases, also approached Plaintiffs at the Atlanta trade show and advised that Plaintiffs not tell people the technology was ready to go. Rather, SawStop should say that it was a prototype technology because saying the technology was ready to go would put pressure on manufacturers.

80.     Thereafter, Plaintiffs began negotiations over licensing the SawStop Technology to a number of Defendants, including Bosch, Black & Decker, Emerson, and Ryobi.

81.     On November 10, 2000, Plaintiffs' employees attended a PTI meeting in Cleveland, OH to demonstrate a prototype saw equipped with SawStop Technology.

82.     Members of PTI, which include but are not limited to Stanley Black & Decker, Bosch Power Tools, Dewalt, Dremel, Hilti, Inc., Hitachi Koki, U.S.A., Ltd., Makita USA, Inc., Milwaukee Electric Tool Corporation, Robert Bosch Tool Corp., Ryobi Technologies, Inc., SKIL Power Tools, and Techtronic Industries Co., Ltd., considered how they as a group could best respond to SawStop Technology.

83.     According to sworn testimony of David Peot, who at the time of his testimony was the retired Director of Advanced Technologies and Director of Engineering at Ryobi, Trial Tr., Day 4, 111:14-112:9, 125:2-126:8, *Osario v. One World Techs. Inc.*, Case No. 06-CV-10725 (D. Mass. Feb. 22, 2010 to March 4, 2010), during PTI meetings table saw manufacturers expressed concerns that if one manufacturer adopted SawStop Technology, then all manufacturers would

be subject to greater liability in future product liability cases. This concern about liability was a reason that the manufacturers decided as a group not to adopt SawStop Technology.

84. Mr. Peot testified, *Id.* at 127:22-25, that he was concerned that, "if another manufacturer were to develop a concept of improved table saw safety, then the manufacturers who don't have that would certainly be at a disadvantage when it comes to product liability."

85. During a February 2001 presentation at the Defense Research Institute in Las Vegas, Daniel Lanier, Black & Decker's national coordinating counsel for product liability litigation, gave a presentation titled "Evidentiary Issues Relating to SawStop Technology for Power Saw." Mr. Lanier stated that if a couple of years passed without implementation of the SawStop Technology, manufacturers could argue in product liability lawsuits that the technology was not viable as evidenced by the fact that no one had adopted it and because it was not an industry standard.

86. Mr. Peot further testified under oath at Trial Tr., Day 4, 109:20 -110, 111:14-112:9, 125:2-126:8, *Osario v. One World Techs. Inc.*, Case No. 06-CV-10725 (D. Mass. Feb. 22, 2010 to March 4, 2010), at a PTI meeting in October 2001, members discussed developing something like SawStop, without having to pay a royalty fee to Dr. Gass.

87. PTI's table saw manufacturers determined at that meeting that they would vote on how to respond to the SawStop Technology. *Id.* at 113:25-114:3.

88. Around the time PTI's table saw manufacturers voted to respond collectively to SawStop Technology, the individual manufacturers ended negotiations with SD3 to license SawStop Technology.

89. In order to conceal the conspiracy and continue to depress the market for SawStop Technology, PTI and its members have asserted and continue to assert that they are working on

or investigating better, safer, and cheaper table saw injury mitigation technology, which has not yet materialized.

### a. Licensing Negotiations with Bosch

90.     On April 17, 2001, Plaintiffs met with Bosch to discuss SawStop Technology and how Plaintiffs thought it was incumbent on saw manufacturers to implement the technology as soon as possible. During that meeting, Peter Domeny, Director of Product Safety of Bosch, said he stayed awake at nights wondering how he was going to defend personal injury lawsuits involving table saws in light of the SawStop Technology.

91.      In June 2001, Plaintiffs began discussions with Bosch about licensing SawStop Technology.

92.     In September 2001, Plaintiffs sent Bosch a draft licensing agreement.

93.     On September 17, 2001, John Remmers, Senior Vice President of New Product Development of Bosch, told Plaintiffs that he was trying to "feel out" other manufacturers to develop a SawStop table saw, but there was no interest from other manufacturers.

94.     In October 2001, Bosch asked Plaintiffs what other manufacturers were doing about licensing the SawStop Technology.

95.     In November 2001, Bosch suddenly ended its communications and licensing negotiations with Plaintiffs for SawStop Technology.

96.     Bosch's refusal to deal with Plaintiffs was part of a concerted refusal to deal conspiracy agreed to by PTI members who manufacture table saws.

97.     In December 2001, Peter Domeny, Director of Product Safety at Bosch, attended a UL standards meeting and spoke out against a regulation for active injury mitigation technology, such as SawStop Technology, on table saws.

### b. Licensing Negotiations with Black & Decker

98.     In October 2000, Plaintiffs began discussions with Black & Decker about licensing SawStop Technology.

99.     Bill Taylor, now President - Fastening & Accessories of Stanley Black & Decker, tried to steer Plaintiffs away from contacting the CSPC.  He specifically advised that if Plaintiffs attempted to contact the CPSC the industry would get together and "squish" them.

100.     In August 2001, after sporadic negotiations with Black & Decker about licensing agreements, Todd Huston, Vice President of Commercial Marketing for Black & Decker approached Plaintiffs at a tradeshow and said that the higher ups at Black & Decker are used to being able to "crush little guys," but SD3's patents gave Plaintiffs leverage that might convince those higher ups not to crush Plaintiffs.

101.     On August 30, 2001, Dr. Gass spoke with Todd Huston, who advised that Black & Decker would pursue implanting SawStop Technology and that it was inevitable that an agreement would be reached.

102.     In April 2002, Adan Ayala sent Plaintiffs a draft licensing agreement, offering a 1% royalty but requiring indemnification by Plaintiffs of Black & Decker.

103.     In June 2002, licensing negotiations with Defendant Black & Decker ended.

104.     Black & Decker's refusal to deal with Plaintiffs was part of a concerted refusal to deal conspiracy agreed to by PTI members who manufacture table saws.

### c. Licensing Negotiations with Emerson

105.     In August 2000, Plaintiffs began negotiations with Emerson by providing demonstrations of SawStop Technology, meeting with them in St. Louis, Missouri and in Oregon.

106.    During meetings in Oregon with Dave Pringle, President of Emerson Tool Company,

Mr. Pringle advised that power tool manufacturers did not like Plaintiffs because the SawStop

Technology created a difficult problem for the manufacturers.  On one hand, ignoring the

SawStop Technology risked product liability lawsuits but on the other, they could not adopt the

technology without paying an unwanted royalty.

107.    Mr. Pringle also advised Plaintiffs that it might be in Emerson's interest to delay

introduction of the SawStop Technology to maximize the return on Emerson's existing

manufacturing tools.

108.    In August 2001, Emerson sent Plaintiffs a draft licensing agreement for SawStop

Technology with a royalty of 3% that could increase to 5% and 8%, depending on market

success.

109.    In September 2001, Emerson advised Plaintiffs that they thought they could get around

SawStop patents.

110.    In January 2002, licensing negotiations with Emerson ended.

111.    Emerson's refusal to deal with Plaintiffs was part of a concerted refusal to deal

conspiracy agreed to by PTI members who manufacture table saws.

### d. Licensing Negotiations with Ryobi

112.    In October 2000, SD3 began discussions with Ryobi about licensing SawStop

Technology, which continued until July 2001.

113.    After a demonstration at Ryobi's Anderson, South Carolina facility, on October 10, 2000,

Ryobi's in-house counsel, Robert Bugos was asked how soon Ryobi would adopt the technology.

Mr. Bugos said, "fast as they can."

114.    During Trial Tr., Day 4, 101:20-102:2, *Osario v. One World Techs. Inc.*, Case No. 06-CV-10725 (D. Mass. Feb. 22, 2010 to March 4, 2010), David Peot, Engineering Director at Ryobi, testified under oath that he was impressed by the SawStop Technology demonstration and urged Ryobi to evaluate the feasibility of incorporating SawStop into Ryobi saws.

115.    Ryobi employees formed a team that outlined what would be needed to incorporate SawStop into Ryobi saws. *Id.* at 103:6-14.

116.    In October 2001, an agreement on terms of the licensing agreement for SawStop Technology to Ryobi was seemingly reached.

117.    On January 18, 2002, Jeff Dils, Ryobi's Executive Vice President of Marketing, signed the agreement and sent it to Plaintiffs for signature. This agreement called for a 3% royalty that would rise to 5% or 8% depending on the success of the technology in the marketplace, and was also non-exclusive so that SD3 could license the technology to other companies.

118.    SawStop objected to wording of the agreement, preventing them from signing it. Defendants advised Plaintiffs that they should expect a revised and corrected agreement. But that revised document never came, despite repeated phone calls between Plaintiffs and Ryobi over the following weeks and months.

119.    In January 2002, Ryobi ceased responding to Plaintiffs regarding the SawStop Technology. Plaintiffs continued to attempt to communicate with Ryobi about the licensing agreement until July 2002. Eventually, Plaintiffs realized Ryobi no longer intended to license the SawStop Technology.

120.    Ryobi's refusal to deal with Plaintiffs was part of a concerted refusal to deal conspiracy agreed to by PTI members who manufacture table saws.

### ii.  Damages

121.   Plaintiffs suffered damages as a result of the conspiracy to boycott the SawStop

Technology.

122.   Mr. Peot, in his February 25, 2010 testimony, Trial Tr., Day 4, 111:14 to 112:9; 125:2 to

126:8, *Osario v. One World Techs. Inc.*, Case No. 06-CV-10725 (D. Mass. Feb. 22, 2010 to

March 4, 2010), admitted PTI member consensus that all should take a SawStop license, or none

take it, since if one or more took a license and offered a product equipped with the SawStop

Technology, the others would be more vulnerable to product liability.

123.   Firms that compete in research and development but lack broad consumer acceptance and

wide distribution seek to patent technology that will bring in substantial license revenue.  When

boycotts by existing major firms are used to deny royalties to small, innovative firms,

competition in product improvements is discouraged, and thus injured, to the detriment of the

inventor and of the innovative aspect of the competitive process.

124.   Plaintiffs estimate that but for Defendants' boycott of SawStop Technology, all table saw

manufacturers would have licensed SawStop Technology.  Licensing royalties would have begun

in 2004 and the SawStop Technology would have been fully implemented on all table saws by

no later than 2008.

### iii.  Plaintiffs Discovery of the Fraudulently Concealed Group Boycott Conspiracy

125.   Defendants gave pretextual reasons for refusing to license the SawStop technology.  For

example, on September 17, 2001, John Remmers, Senior Vice President of New Product

Development of Bosch, told Plaintiffs that he was trying to "feel out" other manufacturers to

develop a SawStop table saw, but that there was no interest from other manufacturers.  As

another example, Ryobi continued to tell plaintiffs they were going to license the SawStop

Technology after Ryobi had decided not to, offering various reasons for not sending Plaintiffs a corrected license agreement.

126.    Notes taken by PTI members suggest participants were not only conscious that their efforts to suppress the SawStop Technology and prevent competition in the design of blade guards utilizing the UL design standard were unlawful but also that these efforts should be concealed.  For example, as evidenced at Trial Tr., vol. 7-B, 1944:18-24, *Stollings v. Ryobi Technologies, Inc.*, Case No. 08-C-4006 (N.D. Ill. July 31, 2012), William Buck, Ryobi Engineer, while taking handwritten minutes during a standard guard design meeting wherein participants discussed not leaving a paper trail, wrote, **"Don't make paper trail."**

127.    Defendants fraudulently concealed their boycott of the SawStop Technology by, among other things, giving separate excuses for not taking a license, holding their key meetings in secret, destroying notes, demanding special protective orders in product liability cases, and refraining from usual record keeping, *etc.*

128.    Because of Defendants' fraudulent concealment of their conspiracy, through the acts of concealment set forth above, Plaintiffs could not have learned and did not learn of the conspiracy through the exercise of their own due diligence to boycott SawStop Technology until the February 25, 2010 testimony of David Peot in a Boston trial, Trial Tr., Day 4, 111:14-112:9, 125:2-126:8, *Osario v. One World Techs. Inc.*, Case No. 06-CV-10725 (D. Mass. Feb. 22, 2010 to March 4, 2010), during which he indicated that Defendants had secretly agreed that none of them would license or use the SawStop Technology.

129.    Before February 25, 2010, Plaintiffs did not know and could not have known that Defendants were engaging in an unlawful conspiracy.

130.    According to Mr. Peot, manufacturers banded together because they were concerned that the SawStop device posed a potential liability for them.  If some manufacturers took a SawStop license while others did not, those who did not would face a "disadvantage" in personal injury suits and product liability cases.  Mr. Peot also testified that in October 2001, Ryobi participated in discussions with other manufacturers, about how to avoid paying a royalty for SawStop Technology.  He also admitted that manufacturers, including Ryobi, voted in October 2001 to pursue a collective response to SawStop.  *Id.*

**B.    CONSPIRACY TO PREVENT UL STANDARDS FROM ADOPTING ACTIVE INJURY MITIGATION TECHNOLOGY**

      **i.    Nature of Conspiracy**

131.    Minutes from a PTI meeting in September 2002 indicate that members would consider a contact avoidance task force project advantageous if it would lead to the standardization of listing and certification requirements.  Such a project would be disadvantageous to members if it were slow or if it was leapfrogged by non-member or non-participating companies who introduced improved guarding or safety devices into the market before the task force completed its work.

132.    According to Mr. Peot's sworn testimony in the *Osorio v. One World Techs. Inc.*, Trial Tr., Day 4, 111:14-112:9, 125:2-126:8, *Osario v. One World Techs. Inc.*, Case No. 06-CV-10725 (D. Mass. Feb. 22, 2010 to March 4, 2010), PTI members wanted a standard guard design so that if a person was injured by a saw they would be unable to point to another table saw guard design, such as SawStop's then existing blade guard, as a better design, and thereby avoid liability.

133.    On December 31, 2002, Dr. Gass submitted to UL a written proposal to modify UL's safety standards in light of the new SawStop Technology.  UL referred the proposal to Standards Technical Panel 745 ("STP 745"), which controls the safety standards for table saws.

134.    Representatives from Defendants Black & Decker, Emerson, Makita, Robert Bosch Tool

Corp., and Ryobi all had or have representatives on STP 745.

135.    STP 745 met on February 11, 2003, to discuss the SawStop proposal, which was rejected

by this STP controlled by representatives of Defendants.

136.    In 2005, with the sixth revision of UL 987, the design requirements were for the first time

substantially changed.  This edition added design requirements for a riving knife - an

antikickback device - and other antikickback devices.  CPSC ANR Staff Briefing Package, p. 4.

137.    The 2007 revision of UL 987 also specified design changes.  It specified that the blade

guard should not be a hood, but rather a modular design with a top-barrier element and two side-

barrier guarding elements.  The seventh edition of UL 987 also specified a requirement for a

permanent riving knife.  CPSC ANPR Staff Briefing Package, p. 4.

138.    In Comments of National Consumers League, Consumer Federation of America,

Consumers Union, Public Citizen, and U.S. PIRG to the U.S. CPSC on "Table Saw Blade

Contact Injuries; Advance Notice of Proposed Rulemaking; Request for Comments and

Information," p. 4 (Feb. 12, 2012), Changes to UL standards that require only new blade guards

as part of a table saw's design will not prevent most injuries resulting from a table saw operator

approaching the blade from the front, where most work pieces are fed into the table saw.

Because a "guard must be designed to allow the work piece to come into contact with the saw

blade, it will likewise allow a hand or arm to contact the blade if approached from the front."

139.    More than 30% of table saw blade contact injuries occurred with the guard in place.

140.    The conspiracy to manipulate UL standards is ongoing.  Peter Domeny, Director of

Product Safety of Bosch, testified under oath in *Santella v. Grizzly Industrial, Inc.*, 3:12-MC-

00131-SI, Evidentiary Hearing Transcript, 39:15-40:3, 43:18-21, 43:5-17, 44:22-24 (Sept. 24,

2012 USDC Oregon), that as of 2012, he was participating in weekly conference calls with representatives from SawStop's competitors organized as a trade association, the Power Tool Institute ("PTI"). Participants in the conference calls include Tom Siwek from Bosch, Mark Hickock from Milwaukee Electric and Ryobi, Bob Bugos from Delta, Daniel Rhodes from Makita, PTI attorney Jim Wilson, Susan Young from PTI, PTI lobbyist Ed Krenik, and Ted Gogoll from Stanley Black & Decker.

141.    Mr. Domeny testified in *Santella v. Grizzly Industrial, Inc.*, 3:12-MC-00131-SI, Evidentiary Hearing Transcript, 60:11-22 (Sept. 24, 2012 USDC Oregon), that he and the PTI are trying to stop SawStop from potential financial benefits he believes SawStop could earn from royalties if Underwriters Laboratories or the U.S. CPSC required active mitigation technology.

### ii. Damages

142.    The change to the UL blade guard standard impacted SawStop, LLC's business, requiring it to change its guard to a guard that complied with the new UL design standards, rather than to performance standards.

143.    Sawstop, LLC incurred significant costs to redesign the table saw blade guards they were manufacturing to comply with the new UL design standards and to reconfigure their manufacturing facilities to produce table saws with guards that complied with the new UL design standards.

144.    SawStop, LLC is prevented from freely competing with Defendants in the design of table saw blade guards by virtue of the UL standards implemented as a result of Defendants' actions.

145.    SawStop, LLC incurred an additional expenses per saw to comply with the UL standards implemented as a result of Defendants' actions.

## C.   CONSPIRACY TO CORRUPT UL STANDARDS TO ADOPT AN INFERIOR GUARD IN PLACE OF ACTIVE INJURY MITIGATION TECHNOLOGY

### i.   Nature of Conspiracy

146.   In 2004, PTI members, who were also members of an Underwriters Laboratory Ad Hoc group, were tasked by themselves to come up with a table saw blade guard design that would be designated by UL as the new blade guard standard.

147.   The new UL blade guard standard was more specific and design-focused (as opposed to a performance standard) than necessary, such that the guards implemented by the manufacturers would all be similar and the manufacturers' liability for having a different guard would be limited.

148.   According to Mr. Peot's testimony in the *Osorio v. One World Techs. Inc.* case, Trial Tr., Day 4, 111:14-112:9, 125:2-126:8, *Osario v. One World Techs. Inc.*, Case No. 06-CV-10725 (D. Mass. Feb. 22, 2010 to March 4, 2010), PTI members wanted a standard guard design so that if a person was injured by a saw they would be prevented from pointing to another design as a better design.

149.   The new UL blade guard standard implemented in 2005 and 2007 was more specific and design-focused (as opposed to a performance standard) than necessary, such that the guards implemented by the manufacturers would all be similar and the manufacturers' liability for having a different guard would be limited.

### ii.   Damages

150.   SawStop, LLC was harmed by the conspiracy to change UL standards to require a new table saw blade guard.

151.   SawStop, LLC was put at a competitive disadvantage relative to where it would have been if it could have offered a better guard to customers.

152. SawStop, LLC lost profits from having to redesign its blade guard.

153. SawStop, LLC incurred substantial costs in connection with retooling and reconfiguring its manufacturing operations to make a new blade guard to meet the new blade guard standard.

## VI.   **FIRST CLAIM**

154. Plaintiffs re-allege and incorporate by reference each and every allegation set forth in above paragraphs.

155. In violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, beginning in about 2001 and continuing until the present, the Defendants agreed to and did refuse to license Saw Stop technology from Plaintiffs.

156. Defendants fraudulently concealed their conspiracy until February 25, 2010.

157. At all relevant times, Defendants attended PTI meetings and conferences, engaging in numerous communications to discuss and effectuate their agreement to refuse to deal with Plaintiffs to license the SawStop Technology.

158. Plaintiffs have been deprived of the benefits of free and open competition.

159. The Defendants' combination or conspiracy is an unreasonable restraint of competition.

160. Plaintiffs have been injured as a proximate result of the Defendants' combination or conspiracy.

161. The combination or conspiracy carried out by Defendants resulted in lost royalties of millions of dollars annually for Plaintiffs.

162. Plaintiffs are entitled to treble damages and injunctive relief to remedy the injuries they have suffered and continue to suffer as a result of the Defendants' violations of Sherman Act § 1.

163. Plaintiffs have suffered damages that they estimate exceed $10 million.

## VII.   SECOND CLAIM

164.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in above paragraphs.

165.    In violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, beginning in or about 2003 and continuing to the present, the Defendants and their co-conspirators, PTI and UL, engaged in a concerted corruption of UL standards for table saws to prevent active injury mitigation technology from becoming a standard of the table saw industry.

166.    At all relevant times, Defendants attended PTI meetings and conferences, engaging in numerous communications to discuss and effectuate their agreement to corrupt UL safety standards for table saws to prevent active injury mitigation technology from becoming a standard of the table saw industry.

167.    Defendants conspired through a private organization, PTI, to effect the UL safety standards in order to prevent the U.S. CPSC from adopting a mandatory regulation that would adopt active injury mitigation technology as the table saw industry standard.

168.    The Defendants have enforced and continue to enforce their conspiracy through ongoing efforts to corrupt UL safety standards for table saws.

169.    Plaintiffs have been deprived of the benefits of free and open competition.

170.    The Defendants' combination or conspiracy is an unreasonable restraint of competition.

171.    Plaintiffs have been injured as a proximate result of the Defendants' combination or conspiracy.

172.    Plaintiffs have suffered damages that they estimate exceed $10 million.

173.    The combination or conspiracy carried out by Defendants resulted in lost sales of table saws equipped with the SawStop Technology and increased expenses for those saws.

174.    Plaintiffs are entitled to and seek treble damages for lost sales during the statutory period

of 4 years (*i.e.* since February 25, 2010, when the conspiracy was discovered) and injunctive

relief to remedy the injuries they have suffered and continue to suffer as a result of the

Defendants' violations of Sherman Act § 1.

## VIII.    THIRD CLAIM

175.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in

above paragraphs.

176.    In violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, beginning in 2004

Defendants and their co-conspirators, PTI and UL, engaged in a concerted corruption of UL

safety standards for table saw blade guards to implement a design standard rather than a

performance standard.

177.    At all relevant times, Defendants attended PTI meetings and conferences, engaging in

numerous communications to discuss and effectuate their agreement to corrupt UL safety

standards for table saw blade guards to implement a design standard rather than a performance

standard.

178.    The Defendants have enforced and continue to enforce their conspiracy through ongoing

efforts to corrupt UL safety standards for table saws.

179.    Plaintiffs have been deprived of the benefits of free and open competition.

180.    The Defendants' combination or conspiracy is an unreasonable restraint of competition.

181.    Plaintiffs have been injured as a proximate result of the Defendants' combination or

conspiracy

182.    Plaintiffs have suffered damages that they estimate exceed $500,000.

183.    The combination or conspiracy carried out by Defendants resulted in increased costs and

38

expenses from reconfiguring of Sawstop, LLC's blade guards.

184.   Plaintiffs are entitled to and seek treble damages for damages incurred during the statutory period of the last four (4) years due to changes to the UL standards brought about by the Defendants conspiracy or combination in violation of Sherman Act § 1.

185.   Plaintiffs are entitled to and seek injunctive relief to remedy the injuries they have suffered and continue to suffer as a result of the Defendants' conspiracy or combination in violation of Sherman Act § 1.

## IX.   DEMAND FOR JURY TRIAL

186.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims as described in this Complaint so triable.

## X.   PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for the following relief:

a.   That the Court adjudge the conduct described in this Complaint to involve *per se* unlawful restraints of trade in violation of Sherman Act §1 and award Plaintiffs appropriate damages, trebled;

b.   That the Court permanently enjoin Defendants and any of Defendants' subsidiaries or affiliates from engaging in any of the conduct described herein;

c.   That the Court award Plaintiffs the costs of this suit, including reasonable attorneys' fees and costs; and

d.   That the Court award Plaintiffs such other relief as the Court may deem just and proper.

Dated: February 20, 2014

By: _____

Daniel M. Cohen
Va. Bar No.79836
211 North Union Street
Suite 100
Alexandria, VA 22314
Telephone: (202)789-3960
Facsimile: (202)789-1813
danielc@cuneolaw.com

Jonathan W. Cuneo
Joel Davidow
Bradford E. Kile
Jennifer E. Kelly
507 C Street, NE
Washington, DC 20002
Telephone:  (202)789-3960
Facsimile: (202)789-1813
jonc@cuneolaw.com
joel@cuneolaw.com
brad@cuneolaw.com
jkelly@cuneolaw.com