IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| SD3, LLC, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 1:14-cv-191 |
| | ) |
| BLACK & DECKER (U.S.), INC., et al., | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION**

THIS MATTER comes before the Court on the Motions to Dismiss Plaintiffs' Amended Complaint.

Plaintiff SD3, LLC is an Oregon limited liability company with its principal place of business in Tualatin, Oregon. Plaintiff SawStop, LLC is also an Oregon limited liability company with its principal place of business in Tualatin, Oregon. SD3 and SawStop ("Plaintiffs") are connected; SD3 is SawStop's parent company. Plaintiffs bring suit against the Defendants: Stanley Black & Decker, Inc., Black & Decker Corp., Black & Decker (U.S.), Inc., Robert Bosch GmbH, Robert Bosch Tool Corporation, Techtronic Industries Co., Ltd., Techtronic Industries North America, Inc., Milwaukee Electric Tool Corp., Ryobi, One World Technologies Inc., OWT Industries, Inc.,

Emerson Electric Company, Hitachi Koki Co., Ltd., Hitachi Koki USA Ltd., Makita Corporation, Makita USA, Inc., Pentair, Inc., Pentair Water Group, Inc., Chang Type Industrial Co., Ltd., Delta Power Equipment Corp., and alleged co-conspirators Power Tool Institute ("PTI") and Underwriters Laboratories, Inc. ("UL").

Plaintiffs' Amended Complaint alleges the following: (I) Violation of Section 1 of the Sherman Antitrust Act ("Sherman Act"), 15 U.S.C. § 1, through a group boycott of Plaintiffs' "SawStop" technology; (II) A second Sherman Act Section 1 violation for conspiring via the PTI and UL to corrupt UL table-saw standards to prevent the Plaintiffs' technology from becoming an industry standard; (III) (against all Defendants except Defendant Emerson) A third Sherman Act Section 1 violation through the corruption of safety standards for table saw blade guards so as to implement a design standard rather than a performance standard; (IV) Violation of Ohio Rev. Code § 1331.04 through the group boycott alleged in Count I; (V) Violation of 740 Ill. Comp. Stat. 10/3 through the "standards conspiracy" alleged in Count II; and (VI) (against all Defendants except Defendant Emerson) Violation of 740 Ill. Comp. Stat. 10/3 through the corruption of industry standards at issue in Count III.

Plaintiffs allege that the Defendants engaged in a "group boycott" of Plaintiffs' table saw safety technology by agreeing to collectively refuse Plaintiffs' offers to license or implement their "Active Injury Mitigation Technology" ("AIMT"), and that Defendants corrupted relevant industry standards to prevent the industry-wide adoption of Plaintiffs' technology.

Plaintiffs allege that in 2000 Dr. Stephen F. Gass approached some of the Defendants to inquire if they would license Plaintiffs' AIMT. The AIMT, or "SawStop" technology, is alleged to significantly reduce the risk of table-saw accidents. Plaintiffs further allege that, beginning in October 2001, some Defendants agreed to boycott "SawStop" out of a concern that if any Defendant adopted Plaintiffs' technology then any non-adopting Defendant could be subjected to greater product-liability exposure for ignoring a commercially-viable safety technology. They also allege that these Defendants and other members of the PTI discussed developing something like the "SawStop" technology – which would give them comparable safety technology without having to pay Dr. Gass a royalty fee. PTI members then allegedly agreed not to license "SawStop" technology or otherwise implement AIMT within a certain period of months following the October 2001 PTI meeting.

Plaintiffs' Amended Complaint also alleges that three of the alleged conspirators, Defendants Black & Decker, Emerson

Electric Company ("Emerson"), and Ryobi, engaged in licensing negotiations with Dr. Gass for months after the alleged conspiracy began. Ryobi signed a "non-exclusive" license agreement and sent it to Plaintiffs in January 2002, but Dr. Gass refused to sign it because of what he described as "minor" issues. Plaintiffs allege that Emerson negotiated with Plaintiffs between 2000 and January 2002 and then cut off negotiations for pretextual reasons. Plaintiffs also allege that Black & Decker negotiated with them for more than two years, and in April 2002 offered a license agreement with a 1% royalty payment. The Plaintiffs thought this unserious, seeking instead an 8% royalty payment.

Plaintiffs allege that after they were unsuccessful in convincing any Defendant to license the technology on their terms, Dr. Gass proposed a safety-standard revision to UL, which provides safety-related certification for table saws. His December 31, 2002 proposed revision would have mandated "SawStop" technology for all table saws. The revision was addressed by UL's Standards Technical Panel ("STP") 745, containing certain Defendants, in February 2003. Plaintiffs allege that due to an agreement among Defendants to vote as a bloc, STP 745 rejected Plaintiffs' proposal on February 11, 2003.

A short time after the STP 745 rejection, Defendant Emerson stopped manufacturing table saws, and some industry members – Defendants Black & Decker, Hitachi USA, Pentair, Robert Bosch GmbH, One World Technologies, and Techtronic Industries – sought to develop alternative safety technology not subject to Plaintiffs' patents. Plaintiffs allege that this served as a veneer to fend off "SawStop's" implementation by the U.S. Consumer Products Safety Commission through which the Plaintiffs also sought to effectively mandate their technology throughout the table-saw industry. Plaintiffs allege that Defendants did work to make incremental improvements to table-saw safety standards over the ensuing years, and UL did amend its safety standards both in 2005 and 2007 to include improved safety features designed to reduce table-saw accidents. But, Plaintiffs allege that Defendants' efforts were intended to prevent "SawStop's" industry-wide imposition.

After failing to agree to a licensing deal with any Defendant and failing to mandate their technology within the industry, Plaintiffs began their ongoing competition with some Defendants in 2004, entering the market of manufacturing and selling AIMT-equipped table saws.

Section 1 of the Sherman Act prohibits concerted action to restrain trade through a "contract, combination in the form of trust or otherwise, or conspiracy," see 15 U.S.C. § 1, but does

not prohibit different market actors ultimately coming to the same conclusion on a particular issue, see Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007). The latter behavior, "parallel conduct," even when "consciously undertaken, needs some setting suggesting the agreement necessary to make out a [Sherman] § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory." See id. Moreover, a conspiracy to refuse to deal must indeed be concerted as businesses generally may refuse to deal with whomever they want. See Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 761 (1984).

To survive Defendants' Motions to Dismiss, Plaintiffs' "allegations must produce an inference of liability strong enough to nudge the [Plaintiffs'] claims across the line from conceivable to plausible." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 256 (4th Cir. 2009) (internal quotations and citations omitted). Accordingly, an alleged antitrust conspiracy is not established simply by lumping "the defendants" altogether. Such pleading instead "must allege that each individual defendant joined the conspiracy and played some role in it because, at the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it." In re Elec. Carbon Prods.

Antitrust Litig., 333 F. Supp. 2d 303, 311-12 (D.N.J. 2004) (citing Jung v. Assoc. of Am. Med. Colls., 300 F. Supp. 2d 119, 163-64 (D.D.C. 2004) (internal quotation marks omitted)). A conspiracy must be alleged by either direct or circumstantial evidence "'that tends to exclude the possibility' that the alleged conspirators acted independently." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986) (quoting Monsanto, 465 U.S. at 764). Finally, while the Plaintiffs receive all inferences drawn in their favor on these Motions to Dismiss, they do not receive the benefit of "unwarranted inferences, unreasonable conclusions, or arguments," see Glassman v. Arlington County, 628 F.3d 140, 146 (4th Cir. 2010) (internal quotation marks and citation omitted), nor allegations based on portions of a document in conflict with its full contents that the Court can take notice of, see Twombly, 550 U.S. at 569 n.13.

As both state laws alleged are construed in light of the Sherman Act, and the Sherman Act provides the basis for the federal claims here, the Court's analysis will center on the Sherman Act allegations. See 70 Ill. Comp. Stat. 10/11 ("[T]he courts of this State shall use the construction of the federal law by the federal courts as a guide in construing this Act."); see also Richter Concrete Corp. v. Hilltop Basic Resources, Inc., 547 F. Supp. 893, 920 (S.D. Ohio 1981), aff'd, 691 F.2d

818 (6th Cir. 1982) (plaintiff's failure to prove its claims under the Sherman Act was a failure to prove its claim under Ohio's Valentine Act). Accordingly, Plaintiffs' state law claims hinge on the fate of their Sherman Act claims.

Turning to the Amended Complaint, Plaintiffs' conspiracy allegations are belied by their negotiating history with varying Defendants. Plaintiffs allege that they negotiated with Defendants Emerson, Ryobi, and Black & Decker, respectively, well after the alleged group boycott began in October 2001. Such history fails to show an agreement to restrain trade. See Greater Rockford Energy & Tech. Corp. v. Shell Oil Co., 998 F.2d 391, 396 (7th Cir. 1993) ("Plaintiffs have failed to show a § 1 violation . . . . Indeed, the conspiracy claim is belied by the fact that four of the eight defendants . . . sold alcohol-blended gasoline during the time of the alleged conspiracy to restrain trade in gasohol.").

The Ryobi negotiations in particular highlight the contradictions within Plaintiffs' Amended Complaint. The Amended Complaint admits that Ryobi signed an agreement with Plaintiffs and sent it to Plaintiffs for signature on January 18, 2002. The agreement called for a 3% royalty that would rise to 5% or 8% – the latter percentage being exactly what Plaintiffs were bargaining for – depending upon the technology's profitability, and still allowed the Plaintiffs to license the

technology to other companies. This occurred within the time that the Amended Complaint alleges that Ryobi was a part of a conspiracy to refuse to deal with the Plaintiffs regarding the very same technology. These events cannot plausibly be characterized as a refusal to deal.

The deficiency within Plaintiffs' group boycott allegations extend to their negotiating history with Black & Decker and Emerson as well. Black & Decker proposed a licensing agreement to Plaintiffs sometime within April and June of 2002 according to the Amended Complaint – six to eight months after the alleged conspiracy formed. Plaintiffs contend that Black & Decker's 1% royalty payment offer was disingenuous, but even extending Plaintiffs the favorable inference that it was does not sufficiently infer conspiratorial conduct. According to Plaintiffs, the alleged conspiracy was a <u>refusal</u> to deal regarding the licensing of Plaintiffs' "SawStop" technology – even a disingenuous offer would contradict the plead conspiracy. Regarding Emerson, it negotiated with Plaintiffs throughout 2000 and 2001 and sent a draft licensing agreement to Plaintiffs around September 2001. These negotiations continued into January 2002, three months after the alleged conspiracy began. Plaintiffs make no allegation that Emerson rescinded its offer.

Plaintiffs also allege negotiations with another Defendant, "Bosch," but their negotiations ceased in September 2001 – the

month before the alleged conspiracy began. What is more, Plaintiffs acknowledge that these negotiations resumed several years later. The sequence of all of these events undermines the Plaintiffs' group boycott allegations.

As to the other Defendants, including Hitachi Koki USA, Makita, Milwaukee Electric Tool, One World Technologies, and Techtronic Industries North America, there are no negotiation allegations - let alone allegations as to each Defendant's refusal to deal. Rather, these Defendants are grouped with the others' purported boycott beginning in October 2001. Yet the failure to allege sufficient evidence "that tends to exclude the possibility that the alleged conspirators acted independently," Matsushita, 475 U.S. at 588 (quotations and citations omitted), results in Plaintiffs' conspiracy allegations failing to cross the line from possible to plausible.

Plaintiffs' conspiracy allegations rely on the February 2010 trial testimony from David Peot, a retired engineer for Defendant Ryobi Technologies, who, they allege, revealed the plead conspiracy during the course of a product liability trial. The trial transcript in the case, Osorio v. One World Techs. Inc., Case No. 06-cv-10725 (D. Mass. 2010) is publicly available and cited to in the Amended Complaint.

Mr. Peot was testifying about an October 2001 email describing PTI's interest in developing competitive safety

devices. That interest manifested in the joint venture discussed <u>supra</u> in 2003. Plaintiffs' Amended Complaint cites a portion of Mr. Peot's testimony where he agrees that a reason for the alleged conspiracy was that "if one manufacturer adopted SawStop and the other manufacturers didn't that they would be subject to potential liability for not adopting something that was shown to be feasible because one manufacturer put it out on the market[.]" The Plaintiffs also cite Mr. Peot confirming that the Defendants sought to develop alternative safety technology so as to avoid paying Dr. Gass a royalty fee.

The inferences Plaintiffs desire from these quotations do not bring their allegations from the possible to the plausible because they conflict with the full quotations from Mr. Peot's testimony, which the Court may take notice of. See <u>Twombly</u>, 550 U.S. at 569 n.13 (finding that "the District Court was entitled to take notice of the full contents of the published articles referenced in the complaint, from which the truncated quotations were drawn.") (citing Fed. R. Evid. 201). The full testimony reveals Mr. Peot disputing the suggestion that the Defendants would not use the technology developed by Dr. Gass, and explaining that the joint venture's purpose was "to use whatever technology we felt would best prevent table saw accidents. There were no limitations that [Mr. Peot] can remember one way or the other." Even the concern over product liability exposure

is revealed in context to be a desire of some individual suppliers to explore alternatives before adopting untested technology with an unknown demand. Plaintiffs' pleading thus fails to explain why the failure of some Defendants to reach a licensing agreement with them is not simply the natural, unilateral reaction to a technology with uncertain commercial viability and safety, and thus does not sufficiently allege a concerted refusal to deal. See Twombly, 550 U.S. at 546; id. at 554 (conduct is not unlawful if "in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market.").

In addition to failing to establish a naked boycott organized for a concerted refusal to deal, Plaintiffs cannot establish harm to competition through the Defendants' alleged conspiracy. See Nw. Wholesale Stationers, Inc. v. Pac. Stationary & Printing Co., 472 U.S. 284, 293-95 (1985) (noting the circumstances in which a group boycott is per se unlawful and thus does not require a separate showing of competitive harm, and excluding the scenario where the boycott is justified by "enhanc[ing] overall efficiency and mak[ing] markets more competitive."). Plaintiffs allege that if "SawStop" became commercially available, then consumers would point to its viability as evidence that other products were inherently unsafe because they lacked the technology; exposing the non-adopting

Defendants to catastrophic product liability. Yet, Plaintiffs state that they entered the table-saw marketplace approximately ten years ago, sold their technology, and have proven its commercial viability. Plaintiffs further concede that Defendants did not subsequently hasten to adopt the technology to avoid the anticipated catastrophic liability exposure. Defendants' purported motivation for the alleged conspiracy is non-existent. Accordingly, the Court finds that the Plaintiffs fail to sufficiently plead facts to establish an agreement to restrain trade in Count I and Count IV.

In Counts II, III, V, and VI of the Amended Complaint, Plaintiffs allege economic injury due to Defendants' alleged "standards conspiracy" by which UL amended its table-saw standard in 2005 and 2007 to make safety improvements, but did not mandate the use of Plaintiffs' patented AIMT technology. Plaintiffs contend that the amendments increased the minimum table-saw-safety standard by requiring an anti-kickback device and a new blade guard. Plaintiffs consider these "incremental improvements" to table-saw safety, but contend that UL should have implemented a standard requiring their AIMT technology. They allege that this did not happen because the UL panel considering safety amendments was under the firm control of the Defendants and they accordingly corrupted the process to prevent the adoption of "SawStop" technology.

The "standards conspiracy" allegations are insufficiently plead and do not allege competitive harm. At the outset, Plaintiffs allege that only Defendants Black & Decker, Emerson, Makita, Bosch, and Ryobi had representatives on the relevant standards-setting committee – there are no allegations that Hitachi Koki, Milwaukee Electric Tool, One World Technologies, or Techtronic Industries North America had any involvement other than being PTI members. Nevertheless, Plaintiff lumps their allegations together against the Defendants, failing to state sufficient facts as to each defendant joining the conspiracy and their role within it. See Total Benefits Planning Agency, Inc. v. Anthem Blue Cross and Blue Shield, 552 F.3d 430, 436 (6th Cir. 2008) ("[A]lleging misconduct against defendants without specifics as to the role each played in the alleged conspiracy" insufficiently alleges an antitrust conspiracy). Even so, neither mere participation in a standards-setting body nor mere membership in a trade association is sufficient to state an antitrust conspiracy claim. See Moore v. Boating Indus. Ass'n, 819 F.2d 693, 712 (7th Cir. 1987) ("There must, instead, be some evidence of actual knowledge of, and participation in, an illegal scheme in order to establish an antitrust violation . . . .") (internal quotation marks and citation omitted). Here, UL did not exclude "SawStop" technology from the market in any way; it merely declined to impose it upon the market. As that is the

most that is alleged against those who merely participated in PTI, the Court finds that Counts II, III, V, and VI fail to state a claim against those Defendants.

Despite Plaintiffs contrary contentions, the "standards conspiracy" as to the remaining Defendants is not per se unlawful and must include a showing of competitive harm, see Consol. Metal Prods., Inc. v. Am. Petroleum Inst., 846 F.2d 284, 291-92 (5th Cir. 1988), which Plaintiffs fail to make. See also Dickson v. Microsoft Corp., 309 F.3d 193, 206 (4th Cir. 2002) (competitive harm "must harm the competitive process and thereby harm consumers") (emphasis in original; citation omitted). Plaintiffs' allegations of competitive harm ultimately amount to lost sales and profits from UL failing to mandate its safety technology upon the market. This is insufficient in at least two respects: One, "lost sales" do not amount to competitive harm because AIMT-product users were not "in some way constrained from buying [Plaintiffs'] products," see Consol. Metal Prods., 846 F.2d at 292; and two, failing to mandate Plaintiffs' proposed safety standard does not thereby harm their market access, see ECOS Elec. Corp. v. Underwriters Laboratories, 743 F.2d 498, 502 (7th Cir. 1984) (approving a competitor's product that does not preclude plaintiff's product does not abuse standards-setting power unless "it is used to exclude competitors from a market by denying them the needed

stamp of approval"). The fact that UL safety standards permitted other safety technologies to compete with Plaintiffs' does not give rise to an antitrust violation.

Only two allegations within the Amended Complaint speak to Defendants' supposed corruption of the UL process. First, Plaintiffs allege that Defendants and the PTI trade association participated in and dominated the UL standards-setting process by voting against a proposal to require AIMT. Plaintiffs put forth no facts, however, alleging that Defendants' participation was either undisclosed or otherwise impermissible. In fact, Plaintiffs acknowledge that standards participants need not consider public interests over their own interests when considering UL standard changes. This says nothing of Plaintiffs' participation within the process and urging of the UL to act in their own interests by mandating AIMT throughout the table-saw industry.

Second, Plaintiffs allege that some Defendants created joint ventures for the purpose of developing new safety technologies which were then promoted to the UL. Again, an antitrust violation is not composed of merely advocating for an industry standard that accords with one's own economic interest.

Plaintiffs' allegations are colored by the reality that they sought to mandate their technology throughout the table-saw industry and reap the royalties of such widely-imposed

technology. Their pleading does not permit the inference "that the [Defendants] had agreed among themselves to do what was only natural anyway," which was to find a more economically-appealing alternative technology. See Twombly, 550 U.S. at 566. The Court finds that nothing about Defendants' standards-setting behavior supports an inference of a pre-existing agreement to boycott, and Plaintiffs' allegations in Counts II, III, V, and VI accordingly fail to state a claim.

An appropriate Order shall issue.

/s/ Claude M. Hilton
CLAUDE M. HILTON
UNITED STATES DISTRICT JUDGE

Alexandria, Virginia
July 15, 2014