IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

|  |  |  |
|---|---|---|
| SD3, LLC, and SAWSTOP, LLC, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 1:14-cv-00191 |
| BLACK & DECKER (U.S.), INC., *et al.*, | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

THIS CASE is before the Court on Defendants' Motion for Summary Judgment.

Stephen Gass and David Fanning founded SD3, LLC and SawStop, LLC in August 2000. Both are attorneys. Mr. Fanning serves as a general counsel for SawStop. Dr. Gass began contacting saw manufacturers about AIMT in 1999. SawStop demonstrated a prototype saw at a trade show in August 2000, and SawStop began discussions with B&D, RBTC and Ryobi thereafter. SawStop first visited B&D on October 11, 2000. According to SawStop, B&D's Bill Taylor told Dr. Gass and Mr. Fanning that B&D would consider partnering with other power tool manufacturers regarding SawStop's AIMT.

At the October 11, 2000 meeting, Mr. Taylor allegedly expressed concern that SawStop would try to get its AIMT mandated by the Consumer Product Safety Commission and, SawStop claims, told SawStop that the industry would get together and squish them if they tried to go to CPSC. Also in October 2000 Ryobi's in-house counsel said that Ryobi should adopt the technology as fast as they can.

On November 10, 2000, SawStop demonstrated its AIMT to members of the Power Tool Institute. Defendants are members of the Power Tool Institute. After the demonstration, Dr. Gass told the audience the terms on which SawStop would be willing to license its AIMT and attendees asked questions. According to Dr. Gass, after SawStop's presentation at the November 10, 2000 meeting ended, PTI lawyer Arthur Herold told the group that they could not collude but have to make their own decisions. And they all got up and went to the other room.

SawStop claims that it has at all times closely monitored industry activity. Publicly available information in 2000 indicated that Power Tool Institute members' combined share in portable electric tools was over 79%. SawStop claimed in 2003 that PTI members, including Defendants, make nearly all the table saws sold in the United States.

In February 2001, Dr. Gass and Mr. Fanning attended a presentation made by Daniel Lanier. Lanier was B&D's national

coordinating counsel for product liability litigation. Mr.
Fanning's notes recorded his belief that Mr. Lanier was implying
that he expects SawStop to be an issue in products liability
cases and that once one company adopts it, all will have to. Mr.
Fanning testified that the takeaway from Lanier's presentation
was that if none of the manufacturers adopt something like the
SawStop technology, then, in these product liability cases, saw
makers can argue that the SawStop technology, or something like
it, is not viable and can use as evidence the fact that nobody's
adopted it. Dr. Gass reached a similar conclusion. SawStop
claims that limiting product liability exposure was the
motivation for the alleged conspiracy.

On July 25, 2001, Dr. Gass spoke with Adan Ayala, an in-
house patent attorney at B&D. According to SawStop, Mr. Ayala
reported that former defendant Emerson Electric Company
("Emerson"), then a saw maker and PTI member, had approached B&D
about a joint venture. Two days later, Dr. Gass spoke with John
Remmers of RBTC. Mr. Remmers allegedly told Dr. Gass that RBTC
had talked with Delta and Emerson, but that they had concerns
about antitrust issues concerning SawStop. In September 2001,
Mr. Remmers allegedly reported to Dr. Gass that RBTC had tried
to feel people out on getting an industry deal but there was not
much interest in joint development. On November 29, 2001, Dr.
Gass was present at a UL meeting where, he claims, the

Defendants' representatives in the working group voiced skepticism about the efficacy of AIMT, and argued against the adoption of any standard requiring the implementation of AIMT. According to Dr. Gass, on January 3, 2002, B&D's Mr. Ayala gave what Dr. Gass interpreted as a warning that SawStop should cooperate more with existing manufacturers or risk having the technology rejected by industry.

In 2001 and 2002, B&D, RBTC, Ryobi and Emerson all engaged in licensing discussions with SawStop. SawStop contends that, in August 2001, Todd Huston from B&D told SawStop that B&D had decided to move forward with SawStop and that it was inevitable that they would reach an agreement. In September 2001, Mr. Remmers told SawStop that RBTC would go forward with the concept but needed more time. As of January 2002, a license agreement between Ryobi and SawStop was seemingly reached, and Ryobi sent SawStop a signed license agreement on January 18, 2002. Contacts with RBTC about SawStop ended suddenly after an October 18, 2001 telephone call with Mr. Remmers. In or around January 2002, negotiations with Ryobi and Emerson collapsed. Ryobi did not correct a minor ambiguity in the signed agreement and decided not to further discuss licensing with SawStop. In the same timeframe, Emerson cut off all license negotiations with SawStop. B&D made a disingenuous license offer between April and

June 2002. Initial negotiations with Bosch, Ryobi, B&D and Emerson had ended by June 2002.

Gass eventually realized that his technology would never be available on table saws unless he made and sold table saws himself, so in the summer of 2002, the SawStop co-founders decided to sell table saws. In February and April 2003, Dr. Gass publicly stated that saw manufacturers had done everything they could to avoid implementing the technology. In 2004, Dr. Gass was interviewed for an article in his hometown newspaper, *The Oregonian*. The article reported Dr. Gass's claim that Defendants were colluding to suppress his technology. It linked this alleged collusion to a desire to avoid the product liability claims that could result because they failed to adopt a technology that could have prevented hand injuries. The article also expressed Dr. Gass's belief that PTI's joint venture was designed to squelch his technology or get around his patents.

Dr. Gass testified that he probably read *The Oregonian* article when it was published. He described *The Oregonian* article's reference to his belief that saw makers were colluding as consistent with his sense of what was going on at the time. In 2005, *Inc. Magazine* reported Dr. Gass's recollection of Mr. Lanier's 2001 presentation was this: If we all stick together and don't license this product, the industry can argue that everybody rejected it so it obviously wasn't viable, thereby

limiting any legal liability the industry might face as a result
of the new technology. Product liability, the article continued,
is the main reason, Gass believes, that the big tool makers are
refusing to deal with him. Dr. Gass testified that he is sure
that he read the *Inc. Magazine* article when it was published.
SawStop distributed the *Inc. Magazine* article to third parties,
describing it as probably the best article that outlines the
history of SawStop, especially in relation to the Power Tool
Industry.

In 2006, SawStop inquired of antitrust counsel regarding a
potential antitrust claim against members of the Power Tool
Institute based on suspicions of collusion. SawStop's suspicions
were based on, among other things, actions by PTI members
concerning SawStop technology, responses to SawStop's
demonstrations, and actions in opposition to active injury
mitigation technology standards by UL or the Consumer Product
Safety Commission. Mr. Fanning explained that over time, you
develop a suspicion because one company and then another company
and then another company expressed sentiments like "[w]e usually
can squish you guys." In that same year, SawStop had at least
seventeen communications with outside counsel seeking or
providing "legal advice concerning potential antitrust claims."

Dr. Gass acted as an unpaid expert witness in at least fifteen products liability cases brought against table saw manufacturers, including Osorio v. One World Tech., Inc., No. 06-10725-NMG (D. Mass.), Kent v. Robert Bosch Tool Corp., 06-CV-11555-RWZ (D. Mass.) and Eddery v. Black & Decker Corp., No. 1:08-cv-10849 (D. Mass.). Dr. Gass initially hoped that these product liability lawsuits would motivate saw manufacturers to change their products to incorporate AIMT. In at least two of the cases in which Dr. Gass acted as an expert witness (Kent and Eddery), Boies Schiller, acting as counsel for personal injury plaintiffs, alleged that the plaintiff's injury could have been mitigated if saw manufacturers had not "colluded" against awStop. Boies Schiller remained one of SawStop's antitrust counsel from no later than September 2006 through the date of its complaint.

In 2008, Dr. Gass submitted a report in a products liability case where he stated that he believed other manufacturers agreed amongst themselves not to license the technology in an attempt to avoid having to redesign their saws. In September 2008, Dr. Gass testified that he believed members of PTI colluded to drive SawStop out of business or to avoid licensing SawStop. On October 7, 2008, the plaintiff in Kent submitted a publicly-available pretrial memorandum to a federal district court in Massachusetts. Boies Schiller served as

counsel for the plaintiff in Kent. In the pretrial memorandum's Statement of the Evidence, the plaintiff in Kent stated that the evidence demonstrated that there was an across-the-board decision by the major manufacturers not to license the technology and that the major manufacturers jointly decided not to deal with the inventors of SawStop.

In 2003, the Federal Register published a notice that Defendants were forming a joint venture for the research and development of technology for power saw blade injury avoidance. When Mr. Fanning read the Federal Register notice in 2003, it led him to suspect an antitrust violation. SawStop did not contact the FTC or Department of Justice regarding its suspicion of antitrust violation until approximately 2013.

Dr. Gass does not recall ever reviewing a complaint from the product liability cases in which he acted as an expert. Dr. Gass testified that the complaints were never of interest to him, and he declined to sign confidentiality undertakings in the product liability cases in which he acted as an expert. Dr. Gass suspected that Boies Schiller had access in the product liability cases in which he served as an expert to documents related to possible collusion. Dr. Gass did not have access to documents available to Boies Schiller in the product liability cases in which he served as an expert because he would not sign

8

the confidentiality undertakings that could have given him access to such documents.

Mr. Fanning investigated his suspicion of an antitrust violation by monitoring the dockets of product liability cases through PACER. Mr. Fanning testified that he monitored filings in Eddery and Kent. Mr. Fanning testified that he could not recall seeing any complaints in products liability cases alleging that there was collusion among saw manufacturers. On November 6, 2008 and March 5, 2009, a former Ryobi employee, David Peot, was deposed in Osorio. Portions of Mr. Peot's testimony from those depositions were designated as confidential under the protective order. By the terms of the protective order in Osorio, confidential information could be disclosed to experts or consultants retained by the receiving party and whose advice and consultation are being or will be used by the party in connection with this action, provided that such experts and consultants have first executed a Confidentiality Pledge.

After June 2002, SawStop did not approach a single defendant for a license to SawStop's AIMT. SawStop has sold its own AIMT-equipped saws. To date, SawStop has collected over $150 million in sales of AIMT-equipped saws. Between 2009 and 2013, B&D, RBTC and Ryobi each approached SawStop for a license. SawStop informed Bosch that the benefits of licensing RBTC to make table saws along the terms we have been discussing

9

sufficiently offsets the costs to SawStop of such a license and that it makes more sense for SawStop to market its own table saws, at least until there is a mandate of some kind. SawStop told B&D that B&D would need to sell more than 13x as many saws as SawStop to generate the same return to SawStop as selling its own saws. In the 2009 to 2013 timeframe, SawStop declined to provide a license to any defendant.

SawStop declined to provide a license to any defendant from 2009 to 2013 because it feared that it would lose sales of its own AIMT saws. SawStop has also refused multiple requests for a license by non-defendant Grizzly Industrial, Inc., another table saw manufacturer, since 2002. Since 2002, SD3, LLC has not licensed its AIMT for use on products sold in the United States to any person or entity other than SawStop, LLC.

SawStop's licensing boycott claim is barred by the statute of limitations and cannot be saved by assertions of fraudulent concealment and continuing conspiracy. SawStop claims it was injured by the alleged boycott by June 2002. At that time, SawStop knew the material facts that it alleged in its complaint. In fact, SawStop and its agents repeatedly stated, in court filings and elsewhere, that SawStop was the victim of collusion by table saw manufacturers. Despite this knowledge, SawStop did not bring a claim and did not investigate.

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R Civ. P. 56(c). "[W]here the facts establishing [plaintiff's] knowledge are not in genuine dispute, the accrual date of its cause of action is determinable as a matter of law." GO Computer, Inc. v. Microsoft Corp., 437 F. Supp. 2d 497, 500, aff'd, 508 F.3d 170 (4th Cir. 2007) (citing, *inter alia*, Brumbaugh v. Princeton Partners, 985 F.2d 157, 162 (4th Cir. 1993), and Pocahontas Supreme Coal Co. v. Bethlehem Steel Co., 828 F.2d 211, 218 (4th Cir. 1987)). For this reason, courts have repeatedly resolved untimely claims through summary judgment. See, e.g., GO Computer, 508 F.3d at 180.

"[T]he principal purpose of limiting statutes is the prevention of stale claims . . . ." Goad v. Celotex Corp., 831 F.2d 508, 511 (4th Cir. 1987). As the Supreme Court has explained, statutes of limitations protect important rights and are "primarily designed to assure fairness to defendants." Burnett v. New York Cent. R. Co., 380 U.S. 424, 428 (1965).

Antitrust claims are subject to a four-year statute of limitations. 15 U.S.C. § 15b; see also GO Computer, 508 F.3d at 177. The four-year limitations period generally starts to run when a defendant commits an act that causes economic harm to a

plaintiff. GO Computer, 508 F.3d at 177 (citing Zenith Radio Corp. v. Hazeltime Research, Inc., 401 U.S. 321, 338 (1971)).

In cases where a plaintiff alleges fraudulent concealment, however, the statutory "clock" begins to run "when the wrong was discovered rather than when it was committed." Id. at 178. Two types of "notice" are particularly relevant where a plaintiff alleges fraudulent concealment: inquiry notice and actual notice. "Inquiry notice . . . charges a person to investigate when the information at hand would have prompted a reasonable person to do so." Id. "Where a plaintiff knows of a pattern of particular actions that a defendant has taken against him, though the pattern's precise scope might be unclear and its exact legal ramifications uncertain, the plaintiff is on inquiry notice of his claim." Id. at 179. The statutory clock starts to run when a plaintiff is on inquiry notice. Id. ("[Inquiry notice] is only the date on which a cause of action accrues and the four year period allotted by Congress for a plaintiff to investigate begins.").

Actual notice refers "to an awareness of sufficient facts to identify a particular cause of action, be it a tort, a constitutional violation or a claim of fraud." Hobson v. Wilson, 737 F.2d 1, 35 (D.C. Cir. 1984), cert. denied, Brennan v. Hobson, 470 U.S. 1084 (1985), abrogated in part on other grounds, Leatherman v. Tarrant County, 507 U.S. 163 (1993). To

have actual notice, "the plaintiff must know facts giving notice of the particular cause of action at issue, not of just any cause of action." Id. Actual notice can be shown by a "confluence of factors." Id. at 39. Knowledge of the injury and the motive of defendants provides a plaintiff with sufficient information to identify the cause of action. Id. at 39-40. In this regard, courts have reasoned that a rule that would require tolling "until proof positive existed of a wrong (which might never be established in fact) would abort the policy of the law of repose in statutes of limitations and of diligence in the equitable principles of permitting suspension of them." Pinney Dock & Transp. Co. v. Penn Cent. Corp., 838 F.2d 1445, 1478 (6th Cir. 1988).

A plaintiff cannot invoke fraudulent concealment if it had actual notice of the claim because the "doctrine of fraudulent concealment does not come into play, whatever the lengths to which a defendant has gone to conceal the wrongs, if a plaintiff is on notice of a potential claim." Hobson, 737 F.2d at 35; see also Hexcel Corp. v. Ineos, 681 F.3d 1055, 1060 (9th Cir. 2012)(same); GO Computer, 508 F.3d at 178 (explaining that fraudulent concealment only stops the statutory clock if, *inter alia*, "the claimant failed to discover those facts within the statutory period"). "[The plaintiff] carries the burden of pleading and proving . . . [it] had *neither actual nor*

*constructive knowledge* of the facts giving rise to its claim despite its diligence in trying to uncover those facts." Hexcel, 681 F.3d at 1060 (citations omitted); see also Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp., 546 F.2d 570, 574 n.3 (4th Cir. 1976).

Here, SawStop's cause of action accrued and the statutory clock started to run as a matter of law by June 2002. In GO Computer, the Fourth Circuit described two situations that start the statutory clock. First, "a cause of action generally accrues when a defendant commits an act that causes economic harm to a plaintiff." GO Computer, 508 F.3d at 177; see also Rotella v. Wood, 528 U.S. 549, 555 (2000) ("[D]iscovery of the injury, not discovery of the other elements of a claim, is what starts the clock."). SawStop alleges that it suffered a "cognizable injury" because, as a result of the alleged boycott, it was "plainly denied a substantial revenue stream [it] would have earned from licensing revenue." By June 2002, RBTC allegedly had suddenly stopped negotiating with SawStop; negotiations with Ryobi and Emerson had, in SawStop's view, collapsed "without sufficient explanation"; and B&D had made what SawStop describes as only a disingenuous offer. There is no genuine dispute that SawStop believed that it had suffered economic injury by June 2002.

The second scenario for starting the statutory clock – inquiry notice – likewise occurred by June 2002. "Where a

14

plaintiff knows of a pattern of particular actions that a defendant has taken against him, though the pattern's precise scope might be unclear and its exact legal ramifications uncertain, the plaintiff is on inquiry notice of his claim." GO Computer, 508 F.3d at 179. SawStop believed that Defendants terminated the licensing negotiations for unexplained or pretextual reasons. This alleged termination by Defendants was a "pattern of particular actions" that was taken against SawStop." Id. at 179. Thus, there is no genuine dispute that SawStop was on inquiry notice as of June 2002.

Furthermore, SawStop was not only aware of its claimed injury in 2002, but it also had an awareness of sufficient facts to identify a particular cause of action. Hobson, 737 F.2d at 35. Indeed, by 2002, SawStop had learned of what it believes are the motive, opportunity, and impact of the alleged conspiracy. SawStop was present in 2000 when, according to Dr. Gass, Defendants allegedly left SawStop's technology demonstration to the PTI in order to collude. It was present in 2001 when Mr. Lanier made statements that SawStop interpreted as stating a motive for collusion against its technology: the fear of increased product liability exposure. And in 2002, SawStop had witnessed the cessation of its license negotiations with Defendants under what it believed were suspicious circumstances.

Based upon this information, SawStop repeatedly accused Defendants of colluding to exclude its technology. Mr. Fanning, the lawyer and manager who fills the role of a general counsel for the company, admitted that SawStop inquired of legal counsel in 2006 about a possible antitrust claim against PTI members, including Defendants, based on suspicions of collusion relating to SawStop technology. SawStop thus actually had identified the particular cause of action at issue, not just any cause of action, and SawStop was aware throughout the limitations period of the persons allegedly responsible for its injury. Those persons were the members of PTI, including Defendants.

SawStop's effort to save its case from the statute of limitations hinges entirely on the argument that it needed Mr. Peot's 2010 testimony to identify its cause of action. The facts do not support SawStop's attempt to downplay its knowledge. The Fourth Circuit's discussion of SawStop's allegations of the elements of its AIMT boycott claim – parallel licensing conduct, something more that indicates agreement (such as purported motive, opportunity, sudden shift in conduct, and pretextual reasons) and anticompetitive effects – makes clear that SawStop knew substantially more than Defendants' mere disengagement from licensing and did not need any facts from Mr. Peot's 2010 testimony to plead its claim, much less identify its cause of

action. Thus, Mr. Peot's testimony was simply cumulative to what SawStop already knew.

By 2002, Sawstop believed that Defendants had engaged in what it alleged to be parallel conduct through Defendants' disengagement from licensing discussions. SawStop knew that Ryobi had sent a signed license agreement, agreed to resolve a minor ambiguity, and then allegedly decided not to further discuss licensing with SawStop without sufficient explanation. SawStop also knew then that Emerson had expressed strong initial interest but that negotiations with Emerson collapsed at about the same time that Ryobi went silent. SawStop also knew that RBTC had stated that it was going to go forward with the SawStop concept but then had likewise gone silent. And SawStop knew B&D had said licensing was inevitable and something they have to do before B&D allegedly reversed course with a disingenuous offer.

Based on SawStop's recitation of Defendants' alleged disengagement from licensing negotiations and as a participant in all the negotiations, there can be no dispute that SawStop was aware in 2002 of the abrupt and unexplained shift in negotiations that SawStop now alleges. SawStop was aware of Defendants' purported motivation for common action by 2001, when Dr. Gass and Mr. Fanning attended Mr. Lanier's presentation. This presentation led SawStop to conclude that Defendants were motivated to conspire to avoid products liability risk. There

can be no dispute that SawStop was aware in 2001 of what it has alleged thirteen years later was a motivation for common action.

There is no factual dispute that SawStop claims to have had knowledge of such meetings by 2002. According to SawStop, B&D and RBTC on separate occasions told Dr. Gass in July 2001 that they had discussed a possible joint venture with other manufacturers to implement SawStop's technology, and RBTC also reported concerns about antitrust. SawStop also pleaded that the table-saw market is highly concentrated, as the Defendants here purportedly control 85% of that market. This information was publicly available by 2000. And in 2006, Dr. Gass submitted comments to the CPSC describing members of the Power Tool Institute, including all the Defendants, as making nearly all the table saws sold in the United States.

SawStop expected manufacturers to adopt its technology because it was a dramatic step forward in safety technology and that, if manufacturers did not adopt the technology, they risked being held liable for injuries that occur with their saws. By 2002, SawStop knew all of the alleged facts essential to state a plausible boycott claim. Dr. Gass and Mr. Fanning both concluded in 2001, after listening to Mr. Lanier's presentation, that Defendants were concerned that licensing SawStop would expose them to product liability risk. In 2000, Dr. Gass allegedly was warned that the industry would get together and squish SawStop;

later in 2000, Dr. Gass claims to have observed Defendants leave a presentation to meet separately and, in his words, "collude"; in 2004, Dr. Gass's hometown newspaper reported his belief that Defendants were "colluding to suppress his technology"; and in 2006, SawStop consulted Boies Schiller and Quinn Emanuel about SawStop's antitrust claim.

Not only does SawStop claim that it did not have actual knowledge, it insists that its decade of inaction can be excused because Defendants fraudulently concealed the existence of the alleged conspiracy. To claim fraudulent concealment in the Fourth Circuit, "a claimant must establish that (1) the party pleading the statute [of limitations] fraudulently concealed facts which are the basis of a claim, and that (2) the claimant failed to discover those facts within the statutory period, despite (3) the exercise of due diligence." Pocahontas, 828 F.2d at 218. SawStop can meet none of these elements.

SawStop cannot raise a genuine fact issue on fraudulent concealment because it cannot point to some trick or contrivance tending to exclude suspicion and prevent inquiry. Rx.com v. Medco Health Solutions, Inc., 322 F. Appx. 394, 398 (5th Cir. 2009). SawStop claims that Mr. Peot's testimony provides evidence of secret meetings to create the alleged conspiracy, but choosing not to publicize a meeting is neither fraudulent nor concealment. Id. at 397-98 (holding that secret

19

communications equates to silence but is not enough to show fraudulent concealment).

SawStop also points to one handwritten document that it claims memorialized an instruction to conspirators to keep only the most recent copies of meeting notes. Deleting old copies of documents does not hide evidence that existed in the most recent versions of those documents. SawStop further points to alleged pretextual justifications that amount to no more than a failure to admit wrongdoing, which does not suffice to establish fraudulent concealment. Boland v. Consol. Multiple Listing Serv., Inc., 868 F. Supp. 2d 506, 518 (D.S.C. 2011); see also GO Computer, 508 F.3d at 179.

SawStop's fraudulent concealment argument also fails as a matter of law because a fraudulent concealment defense requires a showing that the defendant used fraudulent means to keep the plaintiff unaware of his cause of action. Hexcel, 681 F.3d at 1060. SawStop did not rely on Defendants' statements; SawStop in fact believed that a conspiracy existed and was consulting antitrust counsel by 2006. Fraudulent concealment cannot apply unless "the claimant failed to discover those [facts which are the basis of its claim] within the statutory period." Pocahontas, 828 F.2d at 218. Indeed, "fraudulent concealment will toll a statute of limitations only insofar as the injury to the plaintiff and its cause is concealed by the defendants."

20

U.S. ex rel. Miller v. Bill Harbert Int'l Const., 505 F. Supp. 2d 1, 9 (D.D.C. 2007); see also Browning v. Tiger's Eye Benefits Consulting, 313 Fed. Appx. 656, 663-64 (4th Cir. 2009)(no fraudulent concealment where plaintiffs "had clearly discovered the breach or violation that formed the basis of their suit"). SawStop believed by June 2002 that it had been injured by Defendants' termination of licensing negotiations. Thus, it was aware of the claimed injury and its alleged cause, and any alleged fraudulent concealment would not toll the statute of limitations.

SawStop also had other first-hand information by June 2002 – and certainly within the limitations period that ran four years later – that it now contends pointed to a group boycott. It claims to have witnessed Defendants hold a private meeting immediately after seeing a demonstration of SawStop's AIMT. It heard Mr. Lanier allegedly describe the motive to collude. It learned from Defendants that they were talking about working together. It allegedly heard a Defendant threaten to "squish" SawStop. Accordingly, no reasonable fact-finder could conclude that SawStop failed to discover facts that form the basis for its claim within the statutory period.

A party alleging fraudulent concealment must exercise reasonable diligence in investigating its claim. GO Computer, 508 F.3d at 178. Mr. Fanning contends that he investigated

SawStop's potential claim by monitoring the dockets for product liability cases through PACER. In at least two cases Mr. Fanning monitored (Eddery and Kent), Boies Schiller – SawStop's antitrust counsel – alleged on behalf of personal injury plaintiffs that table saw manufacturers had colluded to exclude SawStop's technology from the market. But Mr. Fanning testified that he missed all of the group boycott allegations made in these cases.

In a 2008 pretrial memorandum in Kent, for example, Boies Schiller lawyers told a federal district court that they would prove that there was "an across-the-board decision by the major manufacturers not to license the technology" and that "the major manufacturers jointly decided not to deal with the inventors of SawStop." Had Mr. Fanning read any of these allegations, he would have recognized that Boies Schiller believed it had a Rule 11 basis to allege collusion. Instead, by failing to identify any of these allegations in cases he claimed to be monitoring, Mr. Fanning utterly failed to exercise reasonable diligence.

SawStop's alleged failure to discover, or even inquire into, the conspiracy allegations in the products liability cases their own antitrust lawyers were filing is even more inexplicable given that Dr. Gass served as an expert in Eddery and Kent. But Dr. Gass did not even bother reading the

complaints in the product liability cases where he was an expert witness, claiming they were never of interest to him.

Dr. Gass also could have learned about the facts underlying the allegations of collusion by signing a protective order or confidentiality agreement that would have allowed him to see certain documents that were produced in the cases. But Dr. Gass testified that he chose not to do so. Dr. Gass elected to forego access to discovery materials even though he believed that they might have revealed additional information about a conspiracy. Thus, Dr. Gass's attempts at diligence were just as deficient as Mr. Fanning's.

Moreover, SawStop is charged with the knowledge that Boies Schiller had with respect to the factual basis for the allegations of conspiracy and collusion that it made. King & King Enters. v. Champlin Petroleum Co., 446 F. Supp. 906, 912-13 (E.D. Okla. 1978) (rejecting fraudulent concealment argument in part because plaintiffs' counsel had knowledge of the defendant's participation in the conspiracy twenty-two months prior to the expiration of the statute of limitations); see also Link v. Wabash R. Co., 370 U.S. 626, 634 (1962)("[E]ach party is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney.").

Finally, SawStop failed to contact the FTC or DOJ when the Federal Register published a notice that Defendants were forming a joint venture for the research and development of technology for power saw blade injury avoidance. The very purpose of publishing in the Federal Register pursuant to the NCRPA is to "permit[] private parties to inform the antitrust agencies of any behavior thought to be unlawful or harmful to their interests." When Mr. Fanning read this notice in 2003, the notice led him to suspect an antitrust violation. Yet, still SawStop did nothing. SawStop's diligence thus pales in comparison to the diligence that the plaintiff exercised in GO Computer, where the plaintiff attempted to exercise diligence by bringing its concerns about Microsoft's conduct to antitrust authorities at the FTC when it suspected unlawful competitive conduct. Id. at 179. For all of these reasons, SawStop failed to exercise reasonable diligence as a matter of law, and its failure to do so is an independent ground to grant summary judgment to Defendants.

SawStop's "continuing conspiracy" claim – that it was injured by acts that Defendants committed in furtherance of the conspiracy in the four years prior to filing its complaint – also fails as a matter of law. SawStop has never identified any acts that Defendants committed after February 20, 2010 that it contends were in furtherance of the alleged group boycott. By

its own admission, SawStop never asked for a license from Defendants after June 2002. To the contrary, it was Defendants who repeatedly sought licenses from SawStop. In each case, SawStop chose to end negotiations before reaching terms. SawStop explained that "it makes more sense for SawStop to market its own table saws, at least until there is a mandate of some kind."

Without any evidence of new refusals to deal, there can be no continuing violation and no tolling of the statute of limitations. See Charlotte Telecasters, 546 F.2d at 572-73; Rx.com, 322 F. Appx. at 397 (holding that there was not a continuing violation where defendants did not reiterate their refusals to deal with plaintiff). Accordingly, there is no evidence of an overt act – a refusal to license – that could restart the statute of limitations here, so SawStop's continuing conspiracy claim fails as a matter of law.

For these reasons, summary judgment should be granted for the Defendants. An appropriate order shall issue.

_Claude M. Hilton_
CLAUDE M. HILTON
UNITED STATES DISTRICT JUDGE

Alexandria, Virginia
October 18, 2016

25